THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TRACY STOFER, Defendant-Appellant.

First District (3rd Division) No. 1—86—3244

Opinion filed February 15, 1989.

Michael J. Pelletier and Anna Ahronheim, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Inge Fryklund and Gael M. O'Brien, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McNAMARA delivered the opinion of the court:

Defendant, Tracy Stofer, was found guilty of two counts of murder following a bench trial and was sentenced to a term of 23 years. Defendant appeals, contending that the trial court erred in not suppressing his confession after finding he was arrested without probable cause; that defendant was not proved accountable for the murder beyond a reasonable doubt; that the sentence is excessive; and that it was error to find him guilty on two counts of murder where there was one victim.

Nathaniel Corley, a 16-year-old, was shot and killed at 2:15 a.m. on March 3, 1985. Defendant was subsequently charged along with Ramsey Lewis and Steve Avery. Avery and Lewis accused defendant of shooting Corley, and defendant countered that he drove the car and either Lewis or Avery shot Corley. Defendant's motion for severance was granted. (Lewis and Avery were also convicted, and this court has reversed those convictions and remanded for new trials. *People v. Avery* (1989), 180 Ill. App. 3d 146.

A joint hearing was held on the three codefendants' motions to suppress their statements made to the police. After the initial hearing, the trial court ruled that defendant was not under arrest when he

was originally removed from his home and taken to the police station for questioning. After six hours at the station, he was placed under arrest, but without probable cause. After a second hearing, the trial court concluded that the few hours between the illegal arrest without probable cause and the first inculpatory statement by Lewis, when probable cause to arrest arose, was sufficient to purge any taint. Thus, the motion to suppress defendant's statements was denied.

At the hearing on the motion to suppress, defendant testified that on March 3, 1985, at 11 a.m., the police arrived at his home. His mother, Mrs. Ada Ford, called defendant downstairs from his bedroom. Officers Peter Dignan and Barry Costello, who were not in uniform, were waiting in the living room. Mrs. Ford asked whether they had an arrest warrant. Dignan replied, "No, but he's going down to the station with us." Mrs. Ford asked, "Can you talk to him here?" Dignan replied that they would question defendant at the police station. The officers and Mrs. Ford argued about the absence of an arrest warrant. Dignan told defendant to go upstairs and dress, which he did. When he returned, Dignan put his hand on defendant's back and said, "Let's go."

Costello opened the front door and walked out. Defendant followed, and Dignan came last. Defendant was not handcuffed, but he did not feel free to remain at home. They entered an unmarked police car. Dignan opened the back door and motioned defendant into the car. Costello put his hand on defendant's shoulder. Defendant entered, and Costello shut the door. Dignan locked the rear doors from the front of the car.

At the police station, defendant walked to the interrogation room with one officer on each side of him. In response to the officers' questions, defendant denied knowing anything about the Corley murder. They did not give defendant his *Miranda* rights. Defendant did not ask if he could leave. After the first questioning period, defendant was handcuffed, and Dignan struck defendant on the head several times. The officers then left defendant alone in the room.

Costello testified that he picked up Lewis and Avery and drove them to the station after defendant told the police he had been with them the previous night.

Officer John Yucaitas testified that the shooting occurred at 2:15 a.m. The victim's mother informed Yucaitas of the names of Corley's friends. At 9 a.m., three of those friends, Eric Tate, Harry Elligan, and Tony Flemming, were brought to headquarters for questioning. They were separated. Tate told Yucaitas that on the night of the murder, the victim had told Tate, "Watch your back. Someone might shoot

you." Tate and the victim left a dance and walked to McDonald's. At the dance, at McDonald's, and at a friend's house later, Tate saw three males driving in a gray, two-door Ford Escort hatchback, with papers in the window indicating it was new. The car drove very slowly and appeared to be following them. Elligan told Yucaitas that he last saw the victim on Elligan's front porch at 2 a.m., talking with Elligan's cousin. Yucaitas gave this information to Dignan and Costello, who took over the investigation at about 10 a.m.

Dignan testified that on that day he and Costello interviewed Flemming. Flemming said that on the night before the March 3 murder, he and the victim were accosted by two black males. Flemming said he would try to find out their names. Flemming telephoned within an hour to report that he and a friend had looked through the high school yearbook. They identified defendant as one of the males who had chased them with a pole the night before the shooting.

Dignan and Costello went to defendant's home, where they noted a new gray, two-door, Ford Escort hatchback with a dealer sticker in the window, parked in front of defendant's home. The car matched the description given by Tate.

Dignan testified that defendant's mother was told they were investigating the shooting. Defendant's name had been mentioned as the person who had an altercation with Flemming and the victim the previous Friday night. "And we wanted to talk to him about it. We understood there was a problem with gangs in the area and we also wanted to discuss that." Mrs. Ford called her son and told him to get dressed. "[W]e explained to [Mrs. Ford] that we wanted to talk to him at the Area and after we were through talking to him we'd return him home." They gave Mrs. Ford a business card with the station's address and telephone number.

Dignan unlocked the back car door, and defendant entered. No one touched him. While Dignan did lock defendant's door when he closed it, the locks on the car were standard, with no automatic buttons or master control. Going into the station, defendant followed several steps behind the officers.

At 11 a.m., in an interview room, the officers "told him we were investigating the murder of [Corley] and that his name had been brought up as having an incident the previous Friday night with [Corley], and we wanted to know what was to that incident." Defendant replied that he had had nothing to do with the incident involving Corley and Flemming. Defendant told him that on the previous night he had been driving the gray Ford hatchback. He first went to a party, and then drove around with Thomas Leatherwood, Avery and Lewis.

He did not know Corley.

The interview room door was open. Defendant never asked to leave, was not told to remain there, and was not handcuffed. He was not told that he was free to leave. "We told him that we wanted some time to talk to his friends, Leatherwood, Avery and Lewis, and that we were going to go over to their homes right away and bring them in, talk to them, and we'd get back to him."

At 1 p.m., Dignan and Costello found Lewis, who agreed to go to the station. Lewis told the police that he and defendant were at a party, and then drove around in the gray hatchback until about 1:30 a.m. The officers told Lewis that defendant gave a different version which mentioned other boys. Lewis agreed that Avery and Leatherwood were with them. The officers told Lewis "that we wanted to talk with Steven Avery, and we told him we'd get back to him." Lewis was left in an interview room with the door open. He was not told he could leave, or that he should remain, and was not handcuffed.

At 3 p.m., Dignan and Costello located Avery at his home. At the station, Avery stated that on the previous night he was driven home at about 11:30 p.m. by defendant, and he then went to bed. The officers told Avery that his friends reported a completely different story. Avery denied being with Leatherwood or Lewis.

Around 5 p.m., the three codefendants were placed under arrest and given their *Miranda* rights. Prior to that, they had not been booked or processed in any way. The officers then spoke to Avery and Lewis several times. Avery began crying and stated that he was fearful of being killed if he spoke about the murder. At 7:30 p.m., Lewis made statements incriminating the three codefendants.

At 8 or 8:15 p.m., Costello returned to defendant. He again gave defendant his *Miranda* rights. Costello told defendant that Avery and Lewis accused defendant of shooting Corley. Defendant then stated that he saw the victim on the street. He parked, and Avery and Lewis exited the car and confronted Corley. Defendant then exited the car, heard several shots, and they all returned to the car. Avery or Lewis later threw the gun out the window. In a second statement, defendant stated he got out of the car at the same time as the other two boys.

The police then received defendant's written consent to search his bedroom. The officers searched defendant's room and, at defendant's direction, found an unrelated gun in a leather jacket. At 9 p.m., the officers returned to the station. The assistant State's Attorney and court reporter had arrived. At 9:45 p.m., a formal statement was taken from Lewis. At 10:17 p.m., Avery's statement was taken. At 11:03 p.m., defendant's formal statement was taken.

Dignan testified that a progress report he completed stated that the arrest was made in the morning. Dignan explained, "That's the time he was taken into custody but he was not under arrest. He was in my care." The report also listed Dignan, Costello, Yucaitas and Leraiz as arresting officers. Yucaitas and Leraiz were not at the station between 4:30 and 5 p.m. Moreover, the arrest report stated that the address of the arrest was defendant's home. Dignan explained that this was the place of "initial contact."

James Ford, defendant's stepfather, testified as a rebuttal witness for defendant that on March 3, 1985, at 11 a.m. he was awakened by the front and side doorbells ringing and loud banging on both doors. He let Officers Dignan and Costello into the house. They asked to speak to defendant. Ford went upstairs, woke up his wife, and told her to wake up defendant. In the living room, the Fords asked the police what they wished to question defendant about, and Dignan replied that it was about a shooting. Defendant came downstairs, and Dignan said, "Let's go."

Ford testified further that his wife asked the officers, "I thought you said you wanted to ask him some questions here?" Dignan answered, "We don't question people in the homes." Ford also assumed the police wanted to talk with defendant in his home. The police argued with them with "some hostility."

Ford testified that defendant went upstairs to get his coat and returned to the living room. As the officers left, Dignan walked behind defendant, with his hand on defendant's shoulder. Neither defendant nor his parents told the police they did not want defendant questioned. The officers gave him the address of the station. Ada Ford, defendant's mother, testified similarly in rebuttal.

The trial court held that there was no arrest in defendant's home. It relied on several factors as indications that the police did not manifest an intent to arrest defendant when they asked him to come to the station. The court pointed out that defendant was permitted to go upstairs alone; was not searched; was not handcuffed; was not given *Miranda* rights; was not fingerprinted or photographed; and his parents did not ask to go to the station with defendant. The court found further that when defendant was arrested at the station at 5 p.m., there was no probable cause. Finally, after a separate hearing on the attenuation issue, the court found that the several hours between the illegal arrest at 5 p.m. and defendant's statements at 8 p.m. admitting knowledge of the shooting constituted sufficient attenuation, and the court refused to suppress the confession.

At trial, Elligan testified that on March 2, 1985, at 7 p.m. he met

with the victim, Flemming, and Tate, and they went to a dance at a high school. They left at midnight. They walked to McDonald's, and then went to Elligan's house at about 1:30 a.m. Elligan went to bed, while Corley remained on the front porch with Elligan's cousin. The next day, Elligan and Flemming identified defendant's photograph in their yearbook.

Tate testified similarly. He recalled seeing a new gray Ford Escort after the dance and again at McDonald's. He saw the car again just after he left Elligan and Corley at Elligan's house. Tate was home by 1:30 a.m.

Dignan testified that he investigated the murder. At 11:03 p.m., defendant made a formal statement to the police. The statement, in which defendant admitted his role in the slaying of Corley, a rival gang member, was admitted into evidence.

Defendant contends that his confession resulted from an illegal arrest, and therefore, should have been suppressed. The State counters that defendant voluntarily agreed to accompany the police officers from his home in the morning, and therefore, no arrest occurred; that the arrest at 5 p.m. was supported by probable cause; and that even if the arrest was illegal, the confession need not be suppressed where the taint was sufficiently purged by intervening circumstances.

■ Initially, we hold that the trial court erred in finding there was no arrest at 11 a.m., when the police took defendant from his home.

An arrest occurs when the police inform defendant of a violation, defendant submits to their control, and it is clear that the police intend to arrest defendant and that defendant understands he is being arrested. (*People v. Holloway* (1985), 131 Ill. App. 3d 290, 475 N.E.2d 915.) The fourth amendment provides that all persons are protected against unreasonable searches and seizures. When no "seizure" occurs, no fourth amendment rights have been infringed. *Florida v. Royer* (1983), 460 U.S. 491, 75 L. Ed. 2d 229, 103 S. Ct. 1319.

The test for whether a person has been seized within the meaning of the fourth amendment is whether, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. (*Michigan v. Chesternut* (1988), 486 U.S. 567, 100 L. Ed. 2d 565, 108 S. Ct. 1975; *People v. Wipfler* (1977), 68 Ill. 2d 158, 368 N.E.2d 870.) The test is intentionally imprecise because it focuses on the coercive effect of police conduct taken as a whole, and not on each particular detail of the police conduct in isolation. *Michigan v. Chesternut*, 486 U.S. 567, 100 L. Ed. 2d 565, 108 S. Ct. 1975.

The police may not detain suspects for station house questioning absent probable cause to arrest. (*Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248.) In *Dunaway*, the teenage defendant was taken from his home in a police car to the station and was not informed he was free to leave. The Court found it was a custodial interrogation which required probable cause, even without the "trappings of a technical formal arrest." (*Dunaway*, 442 U.S. at 215-16, 60 L. Ed. 2d at 838, 99 S. Ct. at 2258.) In *People v. Sturdivant* (1981), 99 Ill. App. 3d 370, 425 N.E.2d 1046, the court found defendant was effectively under arrest without probable cause. Defendant had accompanied the police to the station where he was questioned over a 12-hour period.

Similarly, the 18-year-old defendant here was taken from his home by two officers. The police announced that they were taking defendant to the station to be questioned specifically about the Corley murder. The officers refused the parents' requests to question defendant at home. Instead, they insisted that the interrogation had to occur at the station. Defendant was not told he was free to refuse to accompany the officers. The police led defendant to the police car and locked him in the car. Dignan testified that defendant was "taken into custody" at that time. The arrest report shows that 11 a.m. and defendant's home address were the time and place of arrest.

At the station, defendant was not told he was free to leave, thus adding to a reasonable belief that he was under arrest. See *Dunaway v. New York*, 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248; *Florida v. Royer*, 460 U.S. 491, 75 L. Ed. 2d 229, 103 S. Ct. 1319; *People v. Townes* (1982), 91 Ill. 2d 32, 435. N.E.2d 103; *People v. Fitzpatrick* (1982), 107 Ill. App. 3d 876, 438 N.E.2d 222; *People v. McMahon* (1980), 83 Ill. App. 3d 137, 403 N.E.2d 781.

Defendant was kept in an interrogation room for 12 hours. He was left alone for hours at a time, and not brought home after being questioned, as the police had told his parents. Instead, he was told that the police "wanted some time" and would "get back to him," clearly permitting a reasonable belief that he was to remain in the interrogation room until they returned. In the meantime, the police continued the investigatory process by rounding up more teenagers to question. Defendant was questioned intermittently over the 12-hour period until he finally made an inculpatory statement.

Furthermore, the arrest report indicated that Officers Yucaitas and Lepaiz, who participated in the morning investigation, were the arresting officers, despite the fact that they were no longer working at 5 p.m.

■■ In addition, defendant was only 18 years old and had no prior criminal convictions. Youth and inexperience may be considered in determining whether a suspect is voluntarily remaining at the station. (*People v. Cole* (1988), 168 Ill. App. 3d 172, 522 N.E.2d 635; 2 W. La-Fave, Search and Seizure §5.1(a), at 322 (2d ed. 1978).) Moreover, the officers' subjective belief that defendant was free to leave is not determinative where it was not communicated to defendant. *United States v. Mendenhall* (1980), 446 U.S. 544, 64 L. Ed. 2d 497, 100 S. Ct. 1870; *People v. Hardway* (1987), 163 Ill. App. 3d 596, 516 N.E.2d 830; *People v. Fitzpatrick,* 107 Ill. App. 3d 876, 438 N.E.2d 222.

We hold that the trial court erred in finding that no arrest was made at 11 a.m. when defendant was taken by the police from his home to the station. The show of official authority was such that a reasonable person would not have believed he was free to leave. (*Michigan v. Chesternut,* 486 U.S. 567, 100 L. Ed. 2d 565, 108 S. Ct. 1975; *United States v. Mendenhall,* 446 U.S. 544, 64 L. Ed. 2d 497, 100 S. Ct. 1870.) Consequently, any evidence resulting from the statements defendant made to the police would be inadmissible.

■■■ The trial court properly found, however, that there was no probable cause to arrest defendant at 5 p.m. Probable cause to arrest exists where the acts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information are sufficient to warrant a person of reasonable caution in the belief that a crime has been committed by the person being arrested. *Dunaway v. New York,* 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248.

At 5 p.m., the police knew only that defendant drove a certain gray car the previous night; that he chased Corley days earlier; and that Lewis and Avery differed as to who accompanied defendant on the night of the crime. This is insufficient to establish probable cause to arrest defendant for murder. None of the codefendants confessed to any knowledge of, or participation in, the murder. It was not until Lewis implicated all three codefendants that probable cause arose. (See *People v. McGhee* (1987), 154 Ill. App. 3d 232, 507 N.E.2d 33.) We agree with the trial court that there was no probable cause to arrest defendant at 5 p.m. (See *People v. Nash* (1979), 78 Ill. App. 3d 172, 397 N.E.2d 480.) Consequently, there was no probable cause to arrest defendant at 11 a.m.

■■ The determination that an illegal arrest has occurred is not dispositive of the issue of the admissibility of a subsequent confession. The relevant inquiry is whether the confession was obtained by exploitation of the illegality of his arrest. (*Brown v. Illinois* (1975), 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254.) The evidence need not be sup-

pressed if it was obtained by means sufficiently distinguishable to be purged of the primary taint. *People v. White* (1987), 117 Ill. 2d 194, 512 N.E.2d 677, quoting *Wong Sun v. United States* (1963), 371 U.S. 471, 487-89, 9 L. Ed. 2d 441, 455-56, 83 S. Ct. 407, 417-18.

■ The threshold requirement for fourth amendment analysis is whether or not the proper *Miranda* warnings were given. (*Brown v. Illinois*, 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254.) Where the fifth amendment has been violated, the fourth amendment issue need not be reached. (*Dunaway v. New York*, 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248.) Defendant was not given his *Miranda* rights at the time of his 11 a.m. arrest, but was given those rights at 5 p.m. and at 8 p.m. There is no contention that the confession was otherwise involuntary under fifth amendment analysis. See *People v. Ealy* (1986), 146 Ill. App. 3d 557, 497 N.E.2d 101 (station house questioning was functional equivalent of an arrest where defendant was taken from his home, not given *Miranda* rights, and was left alone in interrogation room for long periods while the police continued the investigation).

■ Beyond the threshold requirements of voluntariness, our analysis focuses on the causal connection between the illegality and the confession. (*Brown v. Illinois*, 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254.) The Court in *Brown* identified several factors as particularly important to evaluate the admissibility of confessions obtained after illegal arrests. These factors are the temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, 'the purposefulness and flagrancy of the official misconduct. (*Brown v. Illinois*, 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254.) The burden of showing admissibility rests upon the State. *Brown v. Illinois*, 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254.

■ The temporal proximity here was eight hours between the 11 a.m. arrest and Lewis' 7 p.m. confession implicating himself, Avery and defendant, at which time probable cause to arrest arose, and nine hours between the morning arrest and defendant's 8 p.m. confession. This lengthy span of time can be an aggravating factor, rather than one tending to dissipate the taint of the illegal arrest. *Dunaway v. New York*, 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248; *People v. White*, 117 Ill. 2d 194, 512 N.E.2d 677; *People v. Thomas* (1984), 123 Ill. App. 3d 857, 463 N.E.2d 832; *People v. Sturdivant*, 99 Ill. App. 3d 370, 425 N.E.2d 1046.

The key to whether or not the relevant time constitutes sufficient attenuation depends considerably on whether any intervening event occurred and the nature of that event. See *Dunaway v. New York*

(1979), 442 U.S. 200, 220, 60 L. Ed. 2d 824, 840-41, 99 S. Ct. 2248, 2260-61 (Stevens, J., concurring); *People v. White,* 117 Ill. 2d 194, 512 N.E.2d 677.

■■ In attempting to establish attenuation, the State maintains that presenting defendant with the statements of his companions was an intervening circumstance. The confrontation of an arrestee with untainted evidence may constitute an independent intervening circumstance. (*In re R.S.* (1981), 93 Ill. App. 3d 941, 418 N.E.2d 195.) Confrontation with incriminating evidence purges the taint of an illegal arrest, however, only where the evidence itself is not a product of the illegal arrest. (*Taylor v. Alabama* (1982), 457 U.S. 687, 73 L. Ed. 2d 314, 102 S. Ct. 2664; *People v. Franklin* (1987), 115 Ill. 2d 328, 504 N.E.2d 80; *People v. Thomas,* 123 Ill. App. 3d 857, 463 N.E.2d 832; *People v. Nash,* 78 Ill. App. 3d 172, 397 N.E.2d 480.) Defendant's statement was extracted after being confronted with his codefendants' statements. Avery and Lewis were arrested, however, as a result of defendant's illegal arrest. Moreover, the confrontation of defendant himself occurred only because defendant was unlawfully detained. See W. LaFave, 4 Search and Seizure §11.4(b), at 400 (2d ed. 1987).

In *State v. Winegar* (1985), 147 Ariz. 440, 711 P.2d 579, the State maintained that intervening circumstances were present because a codefendant's statement was presented to defendant at some point between defendant's illegal arrest and his confession. The Arizona Supreme Court rejected this argument and found that the confrontation with the codefendant's statement was itself the result of defendant's illegal arrest and could not intervene to purge the taint of the arrest.

The situation in the present case is nearly identical, and we agree with *Winegar* that confronting defendant with his codefendants' statements did not constitute an intervening event which purged the taint of the illegal arrest. *E.g., People v. Gabbard* (1979), 78 Ill. 2d 88, 398 N.E.2d 574; *People v. Lekas* (1987), 155 Ill. App. 3d 391, 508 N.E.2d 221; *People v. Malloy* (1982), 104 Ill. App. 3d 605, 432 N.E.2d 1291; *People v. Tankson* (1980), 92 Ill. App. 3d 328, 415 N.E.2d 1218.

■■ The final factor to be considered under *Brown* is the purposefulness and flagrancy of the official misconduct. An arrest has a quality of purposefulness where, *e.g.,* it is an expedition for evidence admittedly undertaken in the hope that something might turn up. (See, *e.g., Taylor v. Alabama,* 457 U.S. 687, 73 L. Ed. 2d 314, 102 S. Ct. 2664; *Dunaway v. New York,* 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248; *Brown v. Illinois,* 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254.) The purpose of suppressing evidence obtained as a result of

police conduct which is purposeful and flagrant is to prevent similar conduct on the part of the police in the future and to deny them any benefit from such conduct. *People v. Dortch* (1982), 109 Ill. App. 3d 761, 441 N.E.2d 100.

Here, the police conducted themselves in such a manner that demonstrates they were questioning many people in the hope something would turn up. The process was entirely investigatory. They brought in at least six teenagers over a 12-hour period, questioning them in separate rooms, attempting to gather any potentially relevant information, and finally eliciting conflicting statements. The question of attenuation is a matter of degree. (*Brown v. Illinois*, 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254.) In weighing the relevant factors here, we find the taint emanating from the illegal arrest was not dissipated or attenuated.

■■■ We conclude that the trial court's determination of attenuation is contrary to the manifest weight of the evidence. (See *People v. Lekas*, 155 Ill. App. 3d 391, 508 N.E.2d 221; *People v. Davis* (1980), 86 Ill. App. 3d 557, 407 N.E.2d 1109.) The court erred in admitting the confession on the basis that there was sufficient attenuation between the illegal arrest and the confession. We therefore remand for a new trial, where the confession must be suppressed.

Because we reverse the conviction for trial error, we must decide whether the evidence at the first trial was sufficient to sustain the conviction. *People v. Brooks* (1987), 115 Ill. 2d 510, 505 N.E.2d 336; *People v. Taylor* (1979), 76 Ill. 2d 289, 391 N.E.2d 366; *People v. Massie* (1985), 137 Ill. App. 3d 723, 484 N.E.2d 1213.

■■■ Double jeopardy is not a bar to a new trial where, as in the present case, reversal is the result of trial error, and not the result of evidence which is legally insufficient to sustain the jury's verdict. (*Burks v. United States* (1978), 437 U.S. 1, 57 L. Ed. 2d 1, 98 S. Ct. 2141.) It would be a high price for society to pay if every defendant were granted immunity from punishment because of a trial defect which constituted reversible error. (*Burks v. United States*, 437 U.S. 1, 57 L. Ed. 2d 1, 98 S. Ct. 2141.) If a trial error barred further prosecution, appellate courts would be hesitant to ever find such errors. *Montana v. Hall* (1987), 481 U.S. 400, 95 L. Ed. 2d 354, 107 S. Ct. 1825; *Lovinger v. Circuit Court for 19th Judicial Circuit* (N.D. Ill. 1987), 652 F. Supp. 1336, *aff'd* (7th Cir. 1988), 845 F.2d 739; *People v. Ramirez* (1986), 114 Ill. 2d 125, 500 N.E.2d 14.

■■■ The United States Supreme Court recently held that retrial is permitted when a reviewing court determines that the conviction must be reversed because evidence was erroneously admitted against

defendant, and that without the inadmissible evidence, there would be insufficient evidence to support a conviction. (*Lockhart v. Nelson* (1988), 488 U.S. ___, 102 L. Ed. 2d 265, 109 S. Ct. 285.) A reversal based on trial errors such as the incorrect receipt of evidence implies nothing with respect to defendant's guilt, but merely determines that he was convicted through a judicial *process* which is defective in some fundamental respect. *Lockhart v. Nelson* (1988), 488 U.S. ___, 102 L. Ed. 2d 265, 109 S. Ct. 285, citing *Burks v. United States,* 437 U.S. 1, 57 L. Ed. 2d 1, 98 S. Ct. 2141, *United States v. Key* (7th Cir. 1984), 725 F.2d 1123, *United States v. Tranowski* (7th Cir. 1983), 702 F.2d 668, and *People v. Taylor,* 76 Ill. 2d 289, 391 N.E.2d 366. Accord *Reimnitz v. State's Attorney* (N.D. Ill. 1984), 596 F. Supp. 47, *aff'd as modified* (7th Cir. 1985), 761 F.2d 405; *United States v. Gonzalez-Sanchez* (1st Cir. 1987), 825 F.2d 572; *United States v. Porter* (1st Cir. 1986), 807 F.2d 21. See also *Tibbs v. Florida* (1982), 457 U.S. 31, 72 L. Ed. 2d 652, 102 S. Ct. 2211 (setting of lower limit on appellate court's definition of evidentiary sufficiency); *United States v. Holzer* (7th Cir. 1988), 840 F.2d 1343; *Delk v. Atkinson* (6th Cir. 1981), 665 F.2d 90. See generally 3 W. LaFave & J. Israel, Criminal Procedure §24.4, at 90-91 (1984).

In *People v. Taylor,* 76 Ill. 2d 289, 391 N.E.2d 366, the conviction was reversed because the confession should have been suppressed. The court first found it was error for the appellate court not to reach the question of whether the evidence adduced at trial was sufficient to sustain defendant's conviction for armed robbery. (Accord *People v. Brooks,* 115 Ill. 2d 510, 505 N.E.2d 336.) The court instructed the appellate court to review all the evidence introduced at the first trial.

██ We believe that there was sufficient evidence for the trier of fact to conclude defendant was guilty beyond a reasonable doubt. While we make no finding as to his guilt or innocence which would be binding on retrial, we merely consider the sufficiency of the evidence so as to remove the risk of subjecting defendant to double jeopardy. *People v. Taylor,* 76 Ill. 2d 289, 391 N.E.2d 366.

In so holding, we point to the codefendants' statements. Avery told the police that defendant pulled out a gun and fired four times at the victim. Defendant said, "I think I got him." Lewis first told the police that Avery and defendant left the car and killed the victim. Lewis later confirmed Avery's version. We do not decide whether Lewis' or Avery's statements would be admissible in a new trial of defendant. (See *People v. James* (1987), 118 Ill. 2d 214, 514 N.E.2d 998; *People v. Lekas,* 155 Ill. App. 3d 391, 508 N.E.2d 221.) Thus, we will not address the question of whether defendant will have deriva-

tive standing to raise fourth amendment objections to the admission of Lewis' and Avery's statements. See *Alderman v. United States* (1969), 394 U.S. 165, 22 L. Ed. 2d 176, 89 S. Ct. 961 (codefendants have no special standing and fourth amendment personal rights may not be vicariously asserted; not necessary to exclude evidence against one defendant in order to protect rights of another); see also *People v. Pierce* (1973), 13 Ill. App. 3d 939, 301 N.E.2d 330; *People v. Pohlmann* (1973), 13 Ill. App. 3d 779, 300 N.E.2d 302; see generally 4 W. LaFave, Search and Seizure §11.3(i) (2d ed. 1987).

In light of our holdings, we need not decide the remaining issues.

For the foregoing reasons, the judgment of the circuit court of Cook County is reversed, and the cause is remanded for further proceedings consistent with the holdings stated herein.

Reversed and remanded.

FREEMAN, P.J., and WHITE, J., concur.