THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. MARK VEGA, Defendant-Appellee.

First District (6th Division)   No. 1—91—1960

Opinion filed July 16, 1993.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and James Fitzgerald, Assistant State's Attorneys, of counsel), for the People.

Mark W. Solock and Barry A. Spector, both of Chicago, for appellee.

PRESIDING JUSTICE McNAMARA delivered the opinion of the court:

On April 2, 1987, defendant, Mark Vega, was convicted by a jury of the murder of Christine Special (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(a)) and the attempted murder of Ida Caram (Ill. Rev. Stat. 1983, ch. 38, par. 8—4), and was sentenced to 30 years for each offense, the sentences to run concurrently. On his first appeal to this court, defendant contended that the trial court erred in denying his motions to quash arrest and suppress evidence because an illegal seizure occurred prior to a formal arrest and because no probable cause existed for an arrest. We reversed, finding that defendant was arrested without probable cause. (*People v. Vega* (1990), 203 Ill. App. 3d 33, 560 N.E.2d 983.) We remanded the matter for a hearing as to whether there was sufficient attenuation to purge defendant's later inculpatory statements of the taint of the illegal arrest.

In accordance with our instructions, the trial court conducted an attenuation hearing. After considering the evidence presented and the arguments of counsel, the trial court found that the events which occurred after 1 p.m. on April 3, 1986, when the illegal arrest took place, did not sufficiently attenuate the taint of the arrest. The court consequently ordered that defendant's inculpatory statements be suppressed and that he be granted a new trial. It is from this order that the State now appeals.

In light of the issue presently before us, the facts recited in the first opinion need repeating. On March 13, 1986, 16-year-old Special was shot and killed while driving with Caram in Chicago. Caram told police that two young men had been involved in the shooting, and she gave broad descriptions of the men. Robert Sanchez, the shooter, later pled guilty to the crimes.

On October 1, 1986, a hearing was held on defendant's first motion to quash arrest and suppress evidence.

Maria Medina, defendant's mother, testified that at 12:40 p.m. on April 3, 1986, she received a phone call from Detective Terrence Thedford of the Chicago police department. Thedford told Medina that he and Detective Steve Peterson were coming over to ask defendant some questions about the shooting. Medina told Thedford,

"Fine," and wakened defendant. Twenty minutes later, the officers arrived. Medina allowed them into her home, and when defendant entered the room, Thedford "told him to get his jacket." Medina asked why he had to get his jacket if they were going to question him there. Thedford responded that "they could ask the questions better at the station." They did not ask defendant if he wanted to go to the station, nor did they inform Medina that she could go along. They did not tell Medina that defendant was not required to accompany them. The officers said nothing to defendant while they were inside the house. They told Medina that defendant would be home before she left for work at 3 p.m. Thedford gave Medina his business card with the telephone number for Area 4 headquarters in case she had questions.

Medina told her son to go with the police because "[i]f I know that it's got something to do with the police, you just do what the police say." She did not tell the officers that she did not want her son to talk to them or that she wanted him to have a lawyer. She did not think she could accompany her son to the police station.

Medina's father had telephoned her at work sometime between March 13 and April 3 and told her that the police wanted to speak with defendant. She telephoned the police and asked why they were looking for defendant. They told her that they wanted to ask him some questions about the Special murder. An officer later telephoned and told her that defendant was at the station being questioned. Defendant was subsequently released. After that, Thedford and Peterson came to Medina's home and asked for a photograph of defendant, which she gave them.

Medina told Thedford and Peterson of this earlier questioning when they came to question defendant on April 3, and asked them why he had to be questioned again. They told her that tactical officers did not know how to ask questions and that they knew how to ask them.

Medina watched the officers take defendant to the car. According to Medina, "[t]hey had my son by his arm," and they opened the car door for him. After 3 p.m., Medina telephoned Area 4 several times from her place of employment. She asked to speak with Thedford but was told he was out on the street. Thedford returned her call at approximately 4 p.m. and told her that defendant was not cooperating, and he asked if she could talk him into taking a lie detector test. Thedford said defendant could then go home. Medina spoke with defendant and told him to cooperate so he could go home. She told him if he had no involvement with the homicide, he should take the

test. Defendant did not tell Medina whether he was going to take the test. At that point, "he didn't know." Thedford got back on the telephone and asked what defendant had said to her. Early on the following morning, Medina was told that defendant had made a statement concerning his involvement in the shooting.

Defendant, who was 16 years old at the time of the shooting, testified that sometime around March 24, 1986, the police stopped him on the street and asked about the shooting of a young girl. Subsequently, on April 3, 1986, at approximately 1 p.m., his mother woke him and said the police were coming to talk to him. He did not ask his mother why the police wanted to talk to him, and she did not offer any information. He did not know they wanted to talk about the shooting.

When the officers arrived, they told defendant to put on his coat. Defendant went with the police because "I felt like I didn't have a choice." He felt compelled to go "[b]ecause the tone of voice was deep and they said, you know, get your coat. I obeyed them."

Thedford grasped defendant's arm before they walked out the door. Defendant was between the two officers. While walking down the stairs, defendant told the officers he did not want to go. He had not said that to his mother. The officers responded, "You're going."

Outside, at the unmarked police car, the officers searched defendant after making him stand with his legs spread apart, but they did not handcuff him. Defendant was placed in the back seat of the car, where there were no handles inside the doors. During the 15-minute ride, the officers never told him he was under arrest. Defendant stated that when they got in the car, he discovered that they wanted to question him about the shooting.

At the station, he was placed in an interview room alone. The police said nothing to him. The door was closed and he heard what sounded like a dead bolt engaging. The door had no handle.

Approximately two hours after arriving at the station, defendant spoke with his mother on the telephone. He told her he did not want to stay at the station, and she told him to obey the officers and he could come home. He repeated that he wanted to go home.

Thedford testified for the State that on March 17 or 18, 1986, he went to defendant's home. He believed defendant might have information about the shooting, stating: "I would say I didn't know if he had any more or less involvement than all the other names that came up in this investigation." He knew Caram had seen a photograph of defendant and had not identified it. Thedford had previously left word with defendant's mother and grandfather, and left business cards with

a message that he wanted to talk to defendant, but defendant never contacted the police.

On April 3 at 1 p.m., Thedford and Peterson drove to Medina's home. They had neither an arrest nor a search warrant. When they arrived there, Thedford informed Medina that they were still working on the case and wanted to talk with her son at the police station. Thedford did not recall Medina asking why they could not question defendant at home, but it was possible that she did so. Thedford explained to defendant that they were still investigating the shooting, and he asked defendant if he would come down to the station. Defendant said that he would. Thedford gave Medina his business card with a phone number where he could be reached. The officers did not offer defendant the option of traveling to the station on his own. Leaving the apartment, defendant could have been walking between the two officers. Defendant did not say he did not want to accompany them.

At the police station, defendant was placed in an interview room. He was not handcuffed or advised of his rights. They did not lock the door, but Thedford could not remember if the door was closed. There were handles on the inside of the interview room doors, and defendant was free to leave. At no time, however, did Thedford inform defendant of that fact.

Thedford had a conversation with defendant regarding the shooting of Special. During their conversation, the officers began to have doubts about defendant's statements. In regard to whether defendant was free to leave at that point, Thedford testified: "It never came up." Thedford continued:

"THEDFORD: I am not sure what my decision would have been. I would say I probably would have tried to talk to him some more.

DEFENSE COUNSEL: And you would have tried to talk to him there, correct?

THEDFORD: Correct.

DEFENSE COUNSEL: And you would have tried to discourage him from leaving?

THEDFORD: Yes, but if he wanted to leave, I don't think at that point I could have physically restrained him; had the right to restrain him. I am not sure."

After this conversation, the officers "were finished talking to him." When Thedford left the interview room, he did not know if he closed the door. Defendant was completely cooperative at that point. The po-

lice then tried, unsuccessfully, to contact defendant's girlfriend, whom defendant named as an alibi witness.

The officers wanted defendant to take a lie detector test. Defendant refused to take the test and insisted that he was not required to take it. Thedford did not tell defendant that he could go home. Later, however, defendant said he might take the test. Thedford's report stated that defendant adamantly refused to take the test. It did not say defendant "might" take it. Thedford still did not inform defendant that he could leave. He again left defendant alone in the interview room.

When questioned about the possibility of a lineup, Thedford testified that the decision whether to conduct a lineup including defendant had not yet been made, but the officers were "thinking in that direction." Nevertheless, if defendant had tried to leave then, Thedford did not think he would have physically restrained him. Thedford would have "gone over and talked to him [and] would have explained the circumstances and asked for a reason." When defense counsel asked Thedford whether he would have physically stopped defendant to talk to him, Thedford responded, "It would have depended upon the amount he was deciding to leave with."

At about 4 p.m., Thedford called defendant's mother and told her they had some doubts about defendant's story. He also told her defendant had refused to take a lie detector test. He could not recall if he asked Medina to talk to defendant or if she requested to do so, but defendant spoke with her for 5 or 10 minutes. Afterwards, Thedford spoke with Medina again, "[j]ust to explain to her that we were still talking with her son and that I would have to see what would be the decision made on the investigation with regards to the third watch and what would happen with her son." Thedford turned the case over to Officers Ralph Vucko and John Summerville.

Thedford explained to them the entire investigation of Special's murder, as they were unfamiliar with the case. He explained the circumstances surrounding the questioning of defendant and informed them that a lineup was possible. Thedford also told them that defendant had said he would "think about" whether to take the lie detector test.

Summerville testified that at about 4 p.m., he had his first contact with the Special case. He spoke with Thedford and Peterson and with their supervisor. Summerville was told to continue the investigation. Thedford and Peterson told Summerville they wanted him to run a lineup with defendant. They also told Summerville to see if defendant would take a lie detector test. He knew that defendant earlier had

refused to take the test. He also knew what defendant had told the officers about his activities on the night in question. Summerville had "no suspicions one way or the other" about whether defendant had been involved in a crime.

Summerville went into the interview room in which defendant sat; the room was unlocked. He did not plan on questioning defendant. He simply repeated defendant's earlier statements and asked if that was what defendant had told the other officers. He then asked defendant if he would take the lie detector test. At that point, defendant "said he might take it." Vucko then made a 5 p.m. appointment with the polygraph section, and when he informed defendant of this, he said he would take the test. On cross-examination, however, Summerville testified that his police report indicated only that he "might take the test." Summerville explained: "It was like he would make his mind up when he got to the polygraph. That's how he explained it to me." Summerville further testified that if defendant had tried to leave, he didn't know what he would have done. He would have had to ask the supervisor, who had more knowledge of the case, because at that point defendant was, as far as Summerville knew, just a witness and they were just taking him for a polygraph test. He would not have let defendant leave until he found out "what was going on."

At 5 p.m., the officers drove defendant to 11th and State Street, where the polygraph section was located. They took the file with them, including all the reports and photographs. Within a few minutes after entering the polygraph room, defendant refused to take the test. According to Summerville, defendant said "he didn't want to be a stool pigeon. [He said], 'I can't tell you who the shooter was, but I will point out the name because I saw it in your report.'" At that point, Summerville did not give defendant his rights because he still did not think defendant was a suspect.

Summerville showed defendant the reports, which defendant flipped through, until he came to the page on which Robert Sanchez's name was located. Summerville "asked [defendant] how he knew Mr. Sanchez did the shooting, and he said, 'I know because I was with him before, during and after the incident.'" Summerville then announced defendant's arrest and advised him of his rights. Summerville's police report listed Thedford and Peterson as also being arresting officers, even though they were not present at 5 p.m.

The officers drove defendant back to Area 4. Defendant was still not handcuffed. He was placed in an interview room, and the door was locked. Defendant at no time indicated that he did not wish to speak with the officers or that he wished to leave the station. Sum-

merville spoke with defendant from 5:30 p.m. until 5:45 p.m. He was again advised of his rights. At 10:30 p.m., defendant was given dinner and was told that the police had not yet found Sanchez. At 1 a.m., the officers telephoned felony review, and Assistant State's Attorney Michael Gerber arrived at 2 a.m. At 4:15 a.m., Gerber advised defendant of his rights and took an oral statement from him. At 4:40 a.m., defendant gave a court-reported statement, after again being advised of his rights. A youth officer was present for the first time. Defendant later read the statement, made corrections, and signed it. Prior to giving this statement, defendant was given an opportunity to contact his mother or any other family member.

The trial court found that no seizure was made before 5 p.m. Until that time, the police treated defendant as a witness. The court emphasized that the police did not tell defendant he was under arrest; did not handcuff him; did not lock the interview room door; did not give him his rights; and did not call a juvenile officer. The court believed that defendant was free to leave at any time.

In response to defendant's second motion to quash arrest and suppress evidence, the trial court ruled that probable cause did not exist until the point at which defendant stated that he knew who the shooter was because he was with him before, during and after the shooting.

We reversed the trial court's finding that no seizure had occurred prior to 5 p.m., holding instead that defendant had been illegally arrested in his home at 1 p.m. The trial court's determination that a reasonable person in defendant's situation would have considered himself free to go at that point was held to be manifestly erroneous. The State then argued that even if defendant was unlawfully seized at 1 p.m., there was sufficient attenuation to purge his later inculpatory statements of the taint of the illegal arrest. However, because the trial court was not presented with this issue, we remanded the matter for an attenuation hearing.

At the attenuation hearing, the State called Sergeant Peterson. On the afternoon of April 3, he and Thedford spoke with defendant at Area 4 headquarters. The conversation lasted from 1:30 to 2 p.m. Defendant stated that on the evening Special was shot, he and his girlfriend had gone to a movie and returned to her house at approximately 10:30 p.m. Defendant stayed there for 15 minutes and then went to a restaurant located on the 2800 block of West Cermak. He left the restaurant 30 minutes later and began walking to Robert Sanchez's house, where he was staying at the time. Sanchez lived at 2609 West 21st Place. While walking eastbound on 21st Place, defend-

ant heard six gunshots. He jogged the rest of the way home. Special had been shot at 2658 West 21st Street.

Peterson stated that he told defendant that the police had information placing him closer to the scene of the shooting than he was admitting. Defendant denied being present when the shooting occurred. Defendant was then shown a police report containing a statement made by an unidentified individual which placed defendant at the scene. Defendant again denied being there.

On cross-examination, Peterson stated that Thedford conducted the interview with defendant. Peterson could not recall whether he or Thedford showed defendant the police report, or which of them told defendant about the information from the unidentified individual. Peterson admitted that a supplementary police report which he and Thedford prepared did not mention that defendant had been told that the police had information placing him at the scene of the shooting. Nor did the report mention that they showed it to defendant. Peterson explained that the report was only a summary of what had occurred on April 3 and that, at that point, they considered defendant to be merely a witness.

The State next presented the testimony of Vucko. Vucko testified by stipulating that at 5:30 p.m. on April 3, defendant, after being advised of his *Miranda* rights, gave a complete confession regarding his involvement in the shooting death of Special. This confession was substantially the same as the written confession that was taken the next morning by Assistant State's Attorney Gerber.

The defense offered the stipulated testimony of Thedford, who would have testified that he had no recollection of defendant being told that the police had information placing him closer to the scene of the shooting than he had admitted, nor did he recall defendant being shown the police report.

The trial court found that there was insufficient attenuation to purge the statements of the taint of the illegal arrest. Accordingly, the court ordered that the statements be suppressed and that defendant be granted a new trial.

A trial court's ruling on a motion to suppress will not be overturned unless it is manifestly erroneous. (*People v. Winters* (1983), 97 Ill. 2d 151, 454 N.E.2d 299.) In general, evidence obtained by illegal means must be suppressed if it has been obtained by exploitation of the initial illegality and not "by means sufficiently distinguishable to be purged of the primary taint." (*Wong Sun v. United States* (1963), 371 U.S. 471, 487-88, 9 L. Ed. 2d 441, 455, 83 S. Ct. 407, 417; *People v. White* (1987), 117 Ill. 2d 194, 512 N.E.2d 677.) In the case of a con-

fession following an illegal arrest, the confession must be "sufficiently an act of free will to purge the primary taint of the unlawful invasion." (*Wong Sun*, 371 U.S. at 486, 9 L. Ed. 2d at 454, 83 S. Ct. at 416-17.) The burden of demonstrating attenuation between the illegality and subsequent confession sufficient to render the confession admissible rests upon the State. *People v. White*, 117 Ill. 2d 194, 512 N.E.2d 677.

In *Brown v. Illinois* (1975), 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254, the United States Supreme Court addressed the admissibility of statements made following an illegal arrest. The Court listed the factors to be considered in determining whether a later statement was sufficiently attenuated from the illegality so as to be deemed a product of the defendant's free will, and therefore admissible. These factors are: (1) whether *Miranda* warnings were given; (2) the proximity in time between the arrest and the confession; (3) the presence of intervening circumstances; and (4) the purpose and flagrancy of the police misconduct. *Brown v. Illinois*, 422 U.S. at 603-04, 45 L. Ed. 2d at 427, 95 S. Ct. at 2261-62.

Defendant here made four statements following his illegal arrest at 1 p.m. The first was made at 11th and State four hours after the arrest, followed shortly thereafter by a second, given after he and the officers had returned to Area 4. The third was an oral statement given to Assistant State's Attorney Gerber approximately 11 hours after the first, followed thereafter by a court-reported statement. The State argues that all of these statements were sufficiently attenuated so as to be admissible. After considering the *Brown* factors, the trial court found otherwise. For the reasons set forth below, we conclude that the trial judge did not manifestly err in finding that the State failed to prove attenuation.

■ The record discloses that defendant was not advised of his *Miranda* rights prior to initial questioning by police from 1:30 to 2 p.m. At this point, the officers stated that they considered him to be merely a witness. Even after they began to doubt defendant's story and asked that he take a lie detector test, however, they still did not advise him of his rights. More importantly, defendant was not advised of his *Miranda* rights prior to making his first inculpatory statement to police between 5 and 5:30 p.m. at 11th and State. After defendant had again refused to take the lie detector test, he told Summerville and Vucko that he did not want to be a "stool pigeon," adding, "I can't tell you who the shooter was, but I will point out the name because I saw it in your report." He then identified Robert Sanchez as being the shooter. Notwithstanding that his identification of Sanchez

as the shooter showed that defendant had knowledge of the shooting, the officers still did not give defendant his rights. Summerville then asked defendant how he knew Sanchez did the shooting. In response, defendant stated, "I know because I was with him before, during and after the incident." It was only then that he was advised of his rights. The Supreme Court in *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, held that when an individual is in custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the giving of proper warnings is a prerequisite to the admissibility of any statement made by a defendant. Because the police failed to advise defendant of his constitutional rights prior to asking him the question which prompted the incriminating statement, that he was with Sanchez "before, during and after the shooting," under *Miranda*, this statement is inadmissible against him.

The State appears to argue that the failure to give *Miranda* warnings was not fatal to the admissibility of the first incriminating statement and, in any event, it argues, the proper warnings were given prior to defendant's subsequent statements and should therefore be admissible under the *Brown* analysis. We disagree. Even assuming that defendant was advised of his rights prior to giving the first incriminatory statement, under *Brown*, that statement and the statements which followed would still be inadmissible as they were not sufficiently attenuated from the illegal arrest as to be purged of its taint.

Regarding the temporal proximity of defendant's arrest and his statements, the four statements were made approximately 4, 4½, 15, and 15½ hours after his arrest. The mere passage of time alone, however, is insufficient to purge the taint of an illegal arrest. (*People v. Graham* (1991), 214 Ill. App. 3d 798, 573 N.E.2d 1346.) "The temporal relationship between the arrest and the confession may be an ambiguous factor. If there are no relevant intervening circumstances, a prolonged detention may well be a more serious exploitation of an illegal arrest than a short one. Conversely, even an immediate confession may have been motivated by a prearrest event such as a visit with a minister." (*Dunaway v. New York* (1979), 442 U.S. 200, 220, 60 L. Ed. 2d 824, 841, 99 S. Ct. 2248, 2260-61 (Stevens, J., concurring).) Thus, the key to whether the passage of time constitutes sufficient attenuation depends considerably on whether any intervening events occurred during that time and the nature of those events. *People v. Stofer* (1989), 180 Ill. App. 3d 158, 534 N.E.2d 1287.

The trial court found that the State presented "absolutely no evidence of any intervening circumstances" between 1 and 5 p.m., when defendant gave his first incriminating statement. Similarly, it found that no intervening circumstances had ever been suggested by the State between the time of the illegally obtained statement at 5 p.m. and defendant's subsequent statements.

The State now contends that there were three intervening circumstances between the 1 p.m. arrest and the first statement given at 5 p.m. at 11th and State. It first claims that defendant was confronted with untainted evidence in the form of a police report which produced in him a voluntary desire to confess. Specifically, at the hearing on remand, Peterson testified that during the 1:30 interview of defendant, defendant told the officers that he heard six shots in the area of the shooting, but denied being at the scene. Defendant was then told that they had information placing him closer to the shooting than he was admitting. Peterson stated that he showed defendant a police report which mentioned his name.

Peterson's testimony is questionable, however, since the State offered no testimony at the initial hearing on defendant's motion to suppress that defendant was confronted with a police report; Peterson did not mention this fact in any police report he prepared; and Thedford, who was in the room with Peterson and defendant, had no recollection that this had occurred.

■ Even assuming that the event described by Peterson took place, however, we decline to view it as an intervening circumstance. Even after he was confronted with the police report containing his name, defendant still refused to take the lie detector test, had to be persuaded to consider taking the test by his mother, and still refused to take the test once he arrived at 11th and State. The fact that he persisted in his refusal to take the test belies the State's argument that defendant, of his own free will, confessed several hours later as a result of seeing the report.

The State also cites as an intervening circumstance defendant's telephone conversation with his mother. Up to this point, the State argues, defendant was adamant in his refusal to take the lie detector test. However, after he spoke with his mother, according to Summerville, defendant said he was willing to take the test. Summerville's testimony, however, is the only evidence that defendant ever unequivocally agreed to take the test. According to Medina, even after she spoke with him, defendant was still uncertain whether he would take the test. It is noteworthy that the police report prepared by Summerville indicated that defendant said only that he "might" take the test.

When defendant arrived at 11th and State, he again refused to take the test.

It is apparent from the foregoing that the phone conversation with his mother had no effect on defendant's desire to voluntarily confess. The trial court's finding that the conversation was not an intervening circumstance is bolstered by the fact that the police told Medina that they had doubts about her son's statement regarding his involvement in the shooting and in fact asked Medina to talk her son into taking the test, telling her that if he cooperated he could go home. In our view, the telephone conversation works against the State because it represents a form of improper coercion used to secure an inculpatory statement from defendant while he was being unlawfully detained.

The final intervening circumstance raised by the State is defendant's identification of Sanchez as the shooter. The State contends that defendant identified Sanchez out of a "desire to clear his conscience." As defendant points out, however, the State ignores all of the events which preceded the identification. Defendant was illegally taken from his home at 1 p.m. and brought to Area 4 for questioning. He was not permitted to remain at home during questioning. He was subjected to questioning without the benefit of *Miranda* warnings and was never told that he could leave. He was kept alone in an interview room for concentrated periods of time. He was asked to take a lie detector test, which he refused to do. He was then taken to 11th and State despite the fact that he never fully agreed to take the test. He was seated next to the polygraph machine and again refused to take the test. His persistent refusal to take the test is hardly evidence of an individual exhibiting a willingness to assist the officers or to confess out of a desire to clear his conscience. It was the illegal questioning by the police, and not defendant's desire to "clear his conscience," which prompted defendant to give his first inculpatory statement ("I was with Sanchez before, during and after the incident"), which gave the police probable cause to arrest him.

Having considered the issue of intervening circumstances, we turn to the final *Brown* factor, the flagrancy and purposefulness of the police conduct. "An arrest has a quality of purposefulness where, *e.g.,* it is an expedition for evidence admittedly undertaken in the hope that something might turn up." (*People v. Stofer* (1989), 180 Ill. App. 3d 158, 170, 534 N.E.2d 1287, 1294.) The fourth amendment prohibits such conduct by police officers. *People v. Graham,* 214 Ill. App. 3d 798, 573 N.E.2d 1346.

■ In this case, it is apparent that the officers' sole purpose in arresting defendant at his home was to secure from him an incriminating statement. The officers acknowledged that the purpose of their trip to defendant's home was for questioning, and they were aware that they lacked probable cause to arrest him. Although they testified that they considered defendant to be merely a witness, their treatment of him belies this claim. Thedford and Peterson refused to question him at his home, requiring him instead to accompany them in the police car to the police station. After defendant gave them a statement, the officers did not release him but continued to hold him in an interview room. They never informed defendant he could leave. Instead, they asked him to take a lie detector test, and when he refused, they called his mother and asked her to talk her son into taking the test. The officers still did not tell defendant he could leave. They then transported him to 11th and State to take the test notwithstanding the fact that he never expressly agreed to it. Thedford testified that he was not certain whether he would have permitted defendant to leave had he expressed a desire to do so. He would have tried to discourage him from leaving. Summerville also testified that he would have detained him until he "found out what was going on." These actions on the part of the officers amount to the improper expedition for evidence that the Supreme Court has expressly proscribed. (*Brown v. Illinois*, 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254; *Dunaway v. New York*, 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248.) Accordingly, the initial statement of defendant was properly suppressed.

Having determined that defendant's first incriminatory statement was inadmissible both as a violation of the fifth amendment, pursuant to *Miranda v. Arizona*, and the fourth amendment under *Brown v. Illinois*, we turn briefly to the issue of the admissibility of the later statements. We note at the outset that at the attenuation hearing, the State failed to demonstrate that any intervening circumstances occurred between the first inculpatory statement given at 5 p.m. and the subsequent statements given by defendant after he was "Mirandized." The trial court so found. Moreover, the State offers none on appeal. When an initial statement, made after an illegal arrest, is found to be caused by that arrest, the earlier statement creates a serious doubt that the later statements were made as a result of free will. Instead, the later statement is the result and the fruit of the first. *People v. Thomas* (1980), 80 Ill. App. 3d 1121, 1126, 400 N.E.2d 1019, citing *Brown v. Illinois*, 422 U.S. at 605, 45 L. Ed. 2d at 428, 95 S. Ct. at 2262.

In light of the absence of intervening circumstances between the first and later statements, the trial court properly concluded that the subsequent statements, like the initial statement, were not sufficiently attenuated from the illegal arrest so as to be purged of its taint. Furthermore, it is entirely possible that defendant gave the subsequent confessions because he thought he had already given the same information in an admissible confession. (See *Brown v. Illinois*, 422 U.S. at 605 n.12, 45 L. Ed. 2d at 428 n.12, 95 S. Ct. at 2262 n.12.) The fact that he was in the uninterrupted custody of the same authority when he gave the subsequent statements reinforces this conclusion. As with the first statement, therefore, suppression of the later statements was proper.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

EGAN and RAKOWSKI, JJ., concur.