THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
HENRY LEE THOMAS, Defendant-Appellant.

First District (4th Division)   No. 81—1876

Opinion filed April 26, 1984.

Steven Clark and Bruce Mosbacher, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Paula Carstensen, and Rhoda W. Davis, Assistant State's Attorneys, of counsel), for the People.

JUSTICE ROMITI delivered the opinion of the court:

In a jury trial defendant Henry Lee Thomas was convicted of the murder of Dorothy Terrell and was sentenced to a prison term of 40

years. On appeal defendant contends: (1) his statements should have been suppressed as the products of his illegal arrest; (2) reversal is required because the prosecution adduced trial testimony concerning a polygraph examination of the defendant and because in final argument the prosecutors told the jury that defendant had failed that examination; (3) the jury was not properly instructed on the issues of murder and voluntary manslaughter; (4) the trial court abused its discretion when it sentenced defendant to a 40-year prison term.

We reverse and remand for a new trial.

At trial the State established that on the afternoon of October 21, 1978, the nude body of Dorothy Terrell was discovered in a forest preserve near Waukegan Road and Dundee Road in Cook County. A bedspread and an extension cord were found nearby. An autopsy revealed that her death was caused by multiple stab wounds to the chest and neck. The victim also had blunt trauma injury to the mouth, consistent with having been struck with a fist.

The victim's mother informed the police that she had last seen her daughter on October 15 when she went out on a date with the defendant. Defendant was arrested and first told the police he had dropped off Terrell that night at the home of a girlfriend of hers. However ultimately defendant confessed to having killed Terrell. He told the police and then an assistant State's Attorney that in the early morning hours of October 15 after an evening spent at various Chicago lounges he and Terrell came back to his apartment. After Terrell fell asleep defendant, who was upset about problems they were having, got a knife from the kitchen and stabbed Terrell in the neck. She awoke and said, "Why did you do this, I love you." He struck her twice in the mouth, stabbed her several times in the chest, and smothered her with a pillow. The body remained in his apartment three days. Defendant then wrapped it in a quilt and an electric cord and took it to a wooded area near Dundee Road.

Having lost a pretrial motion to suppress his statements to the police, defendant took the stand and admitted having killed Terrell. He testified that at his apartment, after a night of drinking at several lounges, they began arguing and Terrell struck him in the eye. Defendant, in an intoxicated state, became angry, picked up a knife in the bedroom, and stabbed Terrell. He admitted having told the police that Terrell had been asleep when he stabbed her with a knife from the kitchen, but said he made that statement because he was frightened. He also admitted that his first exculpatory statement to the police was a lie. The jury rejected the defense theory that defendant was guilty only of voluntary manslaughter and convicted him of mur-

der.

## I

We first consider defendant's contention that his statements to the police should have been suppressed because they resulted from his illegal arrest. At the hearing on defendant's motion the following pertinent testimony was adduced. Officer Alvin Riddle of the East Chicago, Indiana, police department testified that on October 23, 1978, he spoke by telephone to Investigators Smith and Behrens of the Cook County sheriff's police. They informed him that defendant was a "likely suspect" in the murder of Dorothy Terrell because she had last been seen in his company. They wished to talk to the defendant and sought Riddle's aid because they believed the defendant worked and lived in East Chicago. Riddle then determined that defendant worked at an East Chicago factory. The night of October 25 Riddle, a Sergeant Johnson, and three members of the tactical unit went to the factory and arrested the defendant as he prepared to leave work. According to Riddle no guns were drawn during the arrest. It was stipulated that the defendant was immediately given his *Miranda* rights (*Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602), and stated that he understood them. He was taken to the factory parking lot where he surrendered his car keys and his car was seized and towed to the police garage. It was subsequently searched and fingerprints and other items were taken for laboratory tests. The tactical unit officers transported defendant to the detention center at the East Chicago police station at about midnight. Investigators Smith and Behrens were then notified of the arrest.

Investigator John Smith testified that on October 21, 1978, he and Investigator Behrens went to Somme Woods and viewed the victim's body. From the state of decomposition Smith concluded that the body had been there three or four days. The following day he learned from members of the victim's family that she had been missing since early Sunday morning, October 15, when she had left on a date with the defendant. Later that Sunday defendant had called the family to ask if the victim was home. The family members had been told by another woman that she had seen the defendant and the victim having an argument or altercation at a lounge that night. Smith was also told where the defendant lived and worked. He contacted the East Chicago police and subsequently learned that defendant had been found by them.

In subsequent rebuttal testimony Investigator Behrens testified that the victim's sister had also told him it had been the defendant's

custom to drive to the apartment every day to wait for the victim but after she became missing he no longer came around. According to Behrens he had also been told by Smith that the manager of the restaurant where the victim worked had stated that there also the defendant had discontinued his practice of visiting the victim since her disappearance.

Smith testified that he arrived at the East Chicago police station at about 1 a.m. on October 26. It was stipulated that defendant was then given his *Miranda* rights and stated that he understood them. Defendant told Smith that late Saturday night or early Sunday morning he had gone drinking with Terrell at several bars. At her request he then dropped her off at the home of a girlfriend of hers. Defendant claimed not to know the girlfriend except by the name Ernestine, and further stated that he left the victim on a street he was not familiar with. He also stated this was the last time he saw her. Defendant offered to help the officers and to do anything they asked. He read and signed forms waiving his *Miranda* rights, waiving his right to challenge extradition, and allowing the police to search his car and his apartment.

At about 3 a.m. Behrens and Smith took the defendant to his apartment where they were met by an evidence technician. Defendant unlocked his bedroom door for the police. Inside they observed blood spattered on the wall above the bed. At about 6:30 a.m. they all left the apartment, taking with them certain items seized there. Defendant was placed in detention at the Maywood sheriff's facility at about 8 a.m. It was stipulated that at 1 p.m. that same day, October 26, defendant voluntarily took a polygraph examination. Smith again saw the defendant at 2:30 p.m., transporting him to the Niles sheriff's facility. According to Smith defendant was then questioned for the next 12½ hours by various officers. At 4:30 p.m. Smith and Lieutenant Brown spoke to the defendant. It was stipulated that he was again informed of his *Miranda* rights. The questioning lasted two or three hours. Other police officers also questioned the defendant until about 3 a.m. the next morning, October 27, when defendant was taken back to Maywood after complaining of being tired and wanting to sleep. Smith testified that defendant was fed prior to questioning and did not complain of any mistreatment. However Smith did state that defendant cried in his presence that day.

On October 27 defendant was brought back to the Niles facility. Smith testified that at 2:30 p.m. defendant gave an inculpatory statement in the presence of Smith, Behrens, an assistant State's Attorney, and a court reporter. In that statement the defendant said he had

been fed, had not been mistreated and had not been threatened. According to Smith the defendant had been questioned for about four hours that day.

The defendant testified to substantially the same sequence of events following his arrest, with the following significant variations. His arrest was at gunpoint. Smith told him, before he signed the consent to the search of his apartment, that if nothing was found he would be released. When taken to the apartment he was in handcuffs but on arrival they were removed and he was told to unlock the door. After he took the polygraph exam he was told it showed he was lying. Defendant recalled that after that examination it was Behrens who drove him to the Niles facility. Behrens stopped the car on the way and talked to the defendant for 45 minutes. He told the defendant he could get the death penalty. According to the defendant the 12½ hours of questioning on the evening of October 26 were conducted by six officers, working in two-man shifts. During the questioning he asked Behrens if he could speak to his mother, but this was denied. In the presence of Smith and Behrens Lieutenant Brown threatened to hit him if he did not talk. Investigator Peterson pushed him against a cabinet, called him a nigger, and told him to talk. At one point during this prolonged questioning defendant requested an attorney but this was refused by Officers Grode and Burke. In the midst of the questioning Officers Peterson and Schenk told him he was going for a ride. He was taken to the forest preserve where the officers said they had found the victim. On the way Schenk told him he had better talk because Peterson was angry. At the site Peterson told him to get out of the car. A patrol car then came on the scene and after Schenk spoke to its occupants the defendant was returned to the Niles facility.

According to the defendant early in the morning of the 27th, when he was taken back to his Maywood cell, Peterson ordered that the blankets from his cell be removed and he "froze" without them. Later that morning Schenk drove him back to Niles. On the way he told the defendant that his treatment by the Cook County police would be even worse than what he had already received. At this point the defendant decided to talk. He subsequently gave the statement introduced at trial.

In rebuttal Lieutenant Brown testified that on October 26 starting at 4:30 p.m. he had personally seen the defendant questioned for eight hours. During that period he did not hear anyone threaten the defendant and did not call him a nigger. At one point during this questioning the defendant said he killed the victim but later he denied

it.

Investigator Behrens stated that during the same period he saw the defendant for three or four hours and never heard the defendant called a nigger or threatened with violence or the electric chair. He also heard the defendant admit to killing the victim and then later deny it during this questioning. Behrens recalled that sometime that evening, on the 26th, the subject of defendant talking to his mother arose but he did not know if defendant was permitted to do so. After the polygraph examination, when he and Smith took the defendant to Niles, they had a "general" conversation with him.

Officer James Peterson testified that at 10 p.m. on October 26 he and Schenk took the defendant, in handcuffs, to the forest preserve "to see if [defendant] was familiar with that area." He denied ever threatening the defendant or calling him a nigger. He merely asked the defendant if he had ever been there before. He also denied removing blankets from the defendant at the Maywood cell.

Officer John J. Grode testified that he was Officer Burke's partner and on October 26 defendant had not requested a lawyer.

It was stipulated that if Officer Schenk were called to testify he would state that on October 27 at 10 a.m. he drove the defendant to Niles. On the way he told the defendant that the blood found in his apartment would be compared with the blood of the victim. He then asked the defendant if he had killed her and defendant admitted that he had, agreeing to talk about it at the station. Schenk denied ever stopping the car to talk to the defendant.

The trial court found that defendant was arrested without probable cause and ordered the suppression of any evidence seized at his apartment or from his car. However the court also found that defendant's subsequent inculpatory statements were sufficiently attenuated from the arrest and therefore denied defendant's motion to suppress his statements. In its ruling the trial court indicated that it did not believe defendant's testimony about have been physically abused or threatened. The attenuating factors specifically cited by the court were the passage of time between the arrest and the statement, the fact defendant was taken to the forest preserve, and the fact defendant was treated well.

■ In oral argument before this court the State has for the first time challenged the trial court's finding that defendant was arrested without probable cause. We find no merit to this contention. Probable cause exists if a reasonable and prudent person in possession of the knowledge which has come to the arresting officer would believe that the person to be arrested had committed a crime. (*People v. Vogel*

(1978), 58 Ill. App. 3d 910, 374 N.E.2d 1152.) Whether probable cause exists in a specific instance depends upon all the facts and circumstances known to the officers at the time of the arrest. (*People v. Robinson* (1976), 62 Ill. 2d 273, 342 N.E.2d 356.) Analysis of these facts and circumstances to determine their sufficiency is the function of the trial court and that court's finding will not be disturbed unless it is shown to be manifestly erroneous. (*People v. Clay* (1973), 55 Ill. 2d 501, 304 N.E.2d 280; *People v. Sakalas* (1980), 85 Ill. App. 3d 59, 405 N.E.2d 1121.) When the victim's body was found in a forest preserve the police estimated that she had been killed three or four days earlier. Yet the last time the defendant was seen with her was six days earlier when they went on a date and were seen quarrelling in a bar. We do not find that the defendant's subsequent inquiry to the family and his failure to attempt to visit her at home or work after apparently being told she was missing can be said to be *indicia* of guilt or innocence. These factors certainly gave the police cause to wish to question the defendant, but we cannot say that the trial court's determination that this was insufficient to establish probable cause to arrest him was contrary to the manifest weight of the evidence.

When a confession is obtained from a defendant through custodial interrogation after an illegal arrest that confession must be suppressed unless the State can meet its burden of establishing that intervening events have broken the causal connection between the illegal arrest and the confession so as to render the confession an act of free will. (*Brown v. Illinois* (1975), 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254; *Taylor v. Alabama* (1982), 457 U.S. 687, 73 L. Ed. 2d 314, 102 S. Ct. 2664.) In *Brown* the court identified a number of factors to be considered in making this evaluation. The fact that *Miranda* warnings have been given and understood, thus establishing voluntariness for purposes of the fifth amendment, is only a threshold requirement to be met by the State in establishing attenuation of the taint of the initial illegality. Other factors to be considered are the temporal proximity of the arrest and the confession, the presence of intervening circumstances such as an appearance by the defendant before a magistrate (a factor found to attenuate the taint in *Johnson v. Louisiana* (1972), 406 U.S. 356, 32 L. Ed. 2d 152, 92 S. Ct. 1620, a case cited by *Brown* as illustrating this factor), and the purpose and flagrancy of the officers' conduct in making the arrest.

It is undisputed that defendant was repeatedly given the *Miranda* warnings and stated that he understood them. But as we have noted this was only a threshold requirement for establishing attenuation. In

its brief on appeal the State has cited two events which it contends were intervening circumstances which prompted defendant's confession without exploitation of his initial illegal arrest. The first factor is one also cited by the trial court, defendant's trip to the forest preserve. In our view interrupting a prolonged interrogation of a defendant to take him, in handcuffs at 10 at night, to a forest preserve where the victim was found cannot be construed as an intervening circumstance which arose independently of the defendant's illegal arrest. The second factors cited in the State's brief is the fact that defendant was told that blood found in his apartment would be compared with the blood of the victim. As the State notes it has been held that confrontation of the arrestee with untainted evidence may constitute an independent intervening circumstance. (*In re R.S.* (1981), 93 Ill. App. 3d 941, 418 N.E.2d 195.) But here defendant was confronted with tainted evidence. The trial court ordered the suppression of this evidence and all other evidence taken from defendant's apartment, apparently finding that the defendant's signed consent was obtained by means of his illegal arrest. The State has not challenged this ruling on appeal. Clearly, confronting the defendant with evidence improperly obtained through exploitation of his illegal arrest cannot be said to constitute an independent intervening circumstance under *Brown.* In oral argument before this court the State has apparently abandoned these contentions, relying instead on the fact that defendant voluntarily submitted to a polygraph examination and was told that he flunked it. Our supreme court has determined that because of doubts as to its scientific validity and because of its tremendous potential for prejudicing a jury polygraph evidence cannot properly be admitted as substantive evidence in a criminal trial (*People v. Baynes* (1981), 88 Ill. 2d 225, 430 N.E.2d 1070), or on a motion for a new trial (*People v. Yarbrough* (1982), 93 Ill. 2d 421, 444 N.E.2d 493), or in imposing sentence. (*People v. Szabo* (1983), 94 Ill. 2d 327, 447 N.E.2d 193.) Given these holdings we do not find that administering such a test to one in custody pursuant to an illegal arrest and then confronting him with the results of what has been judicially held to be a test of dubious scientific validity constitutes the type of independent intervening circumstance contemplated in *Brown.* Indeed, as was held in *Commonwealth v. Brooks* (1976), 468 Pa. 547, 364 A.2d 652, at best the administering of a polygraph examination amounts to yet another form of interrogation, so that giving it to a defendant in custody pursuant to an illegal arrest constitutes yet another means of exploiting that arrest in the hope of obtaining incriminating information. In summary our review establishes that every factor cited by the State as an

independent intervening factor instead was a factor tending to exacerbate the effect of defendant's illegal arrest.

The State also contends that the length of time between the arrest and defendant's confession, 38.5 hours, tended to dissipate the taint of the initial illegality. In *Brown* the court noted that only two hours had elapsed between the defendant's arrest and his incriminating statement, citing this as evidence that the effect of the illegal arrest had not dissipated. But as Justice Stevens, concurring in *Dunaway v. New York* (1979), 442 U.S. 200, 220, 60 L. Ed. 2d 824, 841, 99 S. Ct. 2248, 2261 (Stevens, J., concurring), noted, a prolonged detention, where there are no relevant intervening circumstances, may constitute a more serious exploitation of an illegal arrest than a short detention. (See *People v. Sturdivant* (1981), 99 Ill. App. 3d 370, 425 N.E.2d 1046.) Thus in *Taylor v. Alabama* (1982), 457 U.S. 687, 73 L. Ed. 2d 314, 102 S. Ct. 2664, where the prosecution sought to distinguish the defendant's six-hour detention from the relatively shorter detention period in *Brown,* the court noted that the difference was not significant where during that time the defendant was in police custody, unrepresented by counsel, questioned at length, fingerprinted, and placed in a lineup. And in *Hale v. Henderson* (6th Cir. 1973), 485 F.2d 266, 267-69, cited in *Brown* as a case illustrating the temporal proximity factor, a 42-hour detention period was held not to have dissipated the taint of an illegal arrest where the defendant was in custody the entire time and was subjected to questioning for much of that time. In this cause the defendant's confession came after 38.5 hours of detention during which time he was repeatedly questioned by different officers, confronted with evidence illegally seized in his apartment, given a polygraph examination which he was told he failed, and taken to a forest preserve at 10 p.m. Under these circumstances we find that the length of time between his arrest and his full confession was an aggravating factor rather than one tending to dissipate the taint of the illegal arrest.

The final factor to be considered according to *Brown* is the purpose and flagrancy of the police conduct in arresting the defendant. Defendant here was arrested by five police officers as he left his place of employment. This in itself does not approach the egregious nature of the facts in *Brown* where police broke into the suspect's home, searched it, and arrested him at gunpoint as he came home. But the fundamental misconduct is the same, an arrest made without probable cause for investigatory purposes. The police were aware of some suspicious circumstances relating to the defendant and clearly hoped to obtain incriminating evidence by arresting him and questioning him.

Although four days had elapsed since the discovery of the victim and defendant continued to appear at his place of work, no attempt was made to obtain a warrant for his arrest. No extradition hearing was held before he was taken from Indiana to Illinois, he did not meet with an attorney, and he was not arraigned in the 38.5 hours of detention prior to his confession.

■ In summary, upon a review of all the factors cited in *Brown*, we find the trial court's determination of attenuation to be contrary to the manifest weight of the evidence. With the exception of the absence of physical abuse, the very factors cited by the court as attenuating we have found to have exacerbated the effect of the illegal arrest. The prosecution did not meet its burden of establishing that intervening events broke the causal connection between the illegal arrest and defendant's incriminating statements and therefore defendant's statements should have been suppressed. For that reason his conviction must be reversed and the cause remanded for a new trial.

## II

A second contention of the defendant provides an independent basis for reversal of his conviction. That contention concerns the State's use of polygraph evidence at trial.

Prior to trial defendant had moved to exclude all references to the polygraph examination taken by the defendant. The court withheld its ruling on the motion, indicating that it might permit the State to refer to the examination to counter any defense suggestion that the defendant had been held in custody for a long period of time so as to obtain a confession from him.

In the State's case-in-chief, on redirect examination of Investigator Smith, the State elicited from him, over defense objection, the fact that a "certain test" was given to the defendant after which he was not released. Subsequently on cross-examination of the defendant, again over defense objection, the State elicited from the defendant the fact that he took a polygraph examination and was not then released. In final argument to the jury the prosecutor referred again to the fact that a polygraph examination was administered and that defendant subsequently remained in custody. Later, over defense objection, the prosecutor told the jury, in reference to the defendant having been kept in custody: "They weren't about to let the guy go after he took a polygraph test after he lied to them." Finally in rebuttal argument, a second prosecutor told the jury, in reference to the detention of the defendant, "They are not going to let the son of a gun go after he flunked the polygraph. I keep telling him, flunked the

polygraph." The defense objection to this statement was also over-ruled.

■ The State now concedes that it was error for the trial court to permit these references to a polygraph examination, but contends the error was harmless. We find no merit to this contention. In *People v. Baynes* (1981), 88 Ill. 2d 225, 430 N.E.2d 1070, our supreme court held that the admission of polygraph evidence constituted plain error which impinges upon the integrity of our judicial system. Because of its unreliability, and because it would tend to be viewed by jurors as virtually infallible, the court held that its use, even though stipulated to by the parties, required reversal. Because no objection to the use of the evidence was made at trial in *Baynes* the Illinois Supreme Court was required to consider whether the admission of the evidence was plain error. The court noted that the purpose of the plain error doctrine was to prevent a serious injustice from being done to the defendant and to protect and preserve the integrity and reputation of the judicial process. It is noteworthy that in evaluating the polygraph evidence the court held that the evidence was not so closely balanced as to require examination of the error on the ground that an injustice to the defendant may have resulted. Rather the court concluded that the use of that evidence compromised the integrity and reputation of the judicial process. From this analysis we conclude that in Illinois the use of polygraph evidence in a criminal trial necessarily interferes with the integrity of the judicial process and thus requires reversal regardless of the weight of the other evidence. *People v. Yarbrough* (1982), 93 Ill. 2d 421, 444 N.E.2d 493; see *People v. Lucas* (1981), 88 Ill. 2d 245, 254-55, 430 N.E.2d 1091, 1095-96 (Clark, J., specially concurring).

Even assuming that the use of such evidence could constitute harmless error we do not find this to be such a case. The defendant's defense was that he was guilty of voluntary manslaughter rather than murder. He testified that he killed his girlfriend in the heat of passion engendered by an argument during which she hit him in the eye and he, in an intoxicated condition, stabbed her. The State's position, strenuously argued to the jury, was that the defendant was lying about this. The State supported this argument by pointing to defendant's post-arrest confession in which he said he stabbed the victim in her sleep. Defendant contended that he made this statement only because he was frightened. Thus the credibility of defendant at trial was crucial to his defense. Although defendant himself admitted having lied to the police, he was still entitled to a fair evaluation of his credibility by the jury. When the State informed the jury that defendant

868

had failed a polygraph evidence they introduced devastating evidence on this issue. As our supreme court held in *Baynes*, such evidence could very likely be considered as conclusive by the jury. Accordingly we find that the use of this evidence clearly prejudiced the defendant and requires that his conviction be reversed and the cause remanded for a new trial. Because of our disposition of these two issues we do not address the remainder of defendant's contentions.

The judgment of the trial court is reversed and the cause remanded for a new trial.

Reversed and remanded.

LINN, P.J., and JOHNSON, J., concur.