Jang Han BAE, Petitioner–Appellant,

v.

Howard PETERS, Warden,
Respondent–Appellee.

No. 90–2695.

United States Court of Appeals,
Seventh Circuit.

Argued April 19, 1991.

Decided Dec. 9, 1991.

470

Julius L. Echeles, Chicago, Ill. (argued), for petitioner-appellant.

Arleen C. Anderson, Asst. Atty. Gen., Chicago, Ill. (argued), for respondent-appellee.

Before EASTERBROOK, MANION and KANNE, Circuit Judges.

MANION, Circuit Judge.

Early in the morning of February 1, 1985, a two-story building at 2847 North Milwaukee Avenue in Chicago was destroyed by fire. Three firemen perished while fighting the blaze. The building's first floor housed Vicstar Electronics, a consumer electronics store. Jang Han Bae, one of Vicstar's owners, was convicted of two counts of arson and three counts of murder in Illinois state court. After exhausting his state remedies, Bae filed a petition for habeas corpus in federal court. 28 U.S.C. § 2254. The district court denied the writ without holding an evidentiary hearing. Bae appeals, and we affirm.

I.

The following facts, taken in the light most favorable to the state, are drawn principally from the Appellate Court of Illinois' opinion in Bae's direct appeal. See *People v. Bae,* 176 Ill.App.3d 1065, 126 Ill.Dec. 304, 531 N.E.2d 931 (1st Dist.1988). Bae came to the United States from Korea in 1975 to further his education and, as is characteristic of many immigrants, generally to pursue the "American dream." After receiving his Master's degree in accounting from Roosevelt University in Chicago, Bae worked as a financial manager for a Chicago-area business for several years. In 1982, Bae left that job to pursue his personal dream—to own his own business. Bae and another Korean, Ho Suo Lee, opened Vicstar in 1982 at a location on North Lincoln Avenue in Chicago. In 1983 they moved the business to the building on North Milwaukee Avenue.

Bae's dream soon became a nightmare. In 1983, Vicstar lost money. In 1984, Vicstar made less than $30,000 profit. But despite the small profit, bills were mounting and Vicstar's cash flow was precarious. In late January 1985, Vicstar owed $158,376 to the Korean Exchange Bank in Chicago and $58,000 to a distributor of electronic goods, and had bounced more than $50,000 worth of checks. Vicstar's inventory was also dwindling. A Vicstar creditor visited the store during the last week of January 1985 and noticed that the inventory was "down considerably." A frequent buyer from Vicstar visited the store on January 31 and noticed that the showroom inventory was depleted.

By mid–January 1985, Bae and Lee decided they had had enough and that it was time to get out of business. Unfortunately, the method they chose transformed the nightmare into an even worse reality. Bae and Lee decided to set the building on fire and use the proceeds from Vicstar's $250,000 insurance policy to pay their creditors. In a confession he gave to police several hours after the fire, Bae detailed the arson

scheme and his activities the night before and the morning of the fire.

In mid-January, Lee asked another Korean man named Suk Kim if he would set the fire. Kim said he would; Lee and Bae agreed to pay Kim at least $3,000. They paid Kim $3,000 in cash, the money coming from two days' cash receipts from Vicstar.

Around noon on January 31, Kim called Bae and they agreed to set the fire that night. Kim arrived at the store between 8 and 8:30 p.m. (after Bae had sent his two employees home). Bae gave Kim a key to the store and told him how to set the burglar and fire alarms. Bae left at about 9:00. He drove around in his car for a short time and then went home.

Around midnight, Kim called Bae and told him that "if nothing happened, just go to the store [the next] morning as usual." Almost four hours later, Bae received a phone call from the company that monitored Vicstar's alarm system informing Bae that the alarm had gone off. About thirty minutes later, the same person called back and told Bae that the store across the street was on fire but that his store was fine. At about 6:00 a.m., Bae went to Vicstar and found (contrary to what his alarm company had told him) his building on fire.

The fire had devastating consequences. A family living in the second-floor apartment above Vicstar barely managed to escape death and injury by jumping to the roof of an adjacent building; the only possessions they were able to save were the clothes on their backs. Four Chicago firemen were not so lucky. The four had climbed to the building's roof to cut a hole to vent hot gasses so that other firemen could fight the fire from within the building. While the firemen were on the roof, the roof collapsed. Three of the firemen were plunged into the inferno below and burned to death. The fourth managed to escape falling into the building by jumping up and grabbing on to "something" (exactly what, he was not sure). However, the lower portion of his body was on fire and a fireball billowing up engulfed his face. (The heat was so intense it melted his hel-met to his head.) He eventually made it to the coping of the roof, and then rolled onto an adjacent roof, where he kept rolling until he extinguished the flames on his body. Although he lived, he was badly burned and disfigured, and faced years of painful skin grafts.

At trial, there was no dispute that arson caused the fire. Investigators at the scene found plastic bottles containing isopropyl alcohol. The fire started when the bottles containing the alcohol were ignited. A search of Kim's garage turned up two cases of bottles of isopropyl alcohol. One case was shy six bottles. The bottles in the partially-empty case bore markings similar to the markings on the bottles found at the fire scene.

Besides turning up the isopropyl alcohol bottles, the search of Kim's garage and home also turned up boxes of electronic equipment from Vicstar. In his confession, Bae stated that he and Lee agreed to pay Kim "$3,000 at first." This implied that Kim received more than $3,000; the state's theory was that merchandise from Vicstar was the extra payment. Kim's home was not the only place the police found Vicstar merchandise. A search of Bae's home also turned up over thirty pieces of electronic equipment and at least ten pieces of photographic equipment from Vicstar. The state argued Bae removed this merchandise in anticipation of the fire.

Evidence at trial tended to show that the arson was an inside job. The building's front door was secured by two sets of iron-barred burglar gates. The back door was also secured by similar burglar gates. Bae admitted that on the night of the fire the store was securely locked up and that a person would have needed a key to enter. This coincided with the statements in Bae's confession that he let Kim into the building and that he gave Kim a key.

## II.

Although the state introduced evidence to prove (among other things) the fire's origin and to connect Bae to Kim and Kim to the fire, the centerpiece of the state's

case remained Bae's statements to the police. Bae argues that introducing his confession at trial violated his right to be free from compelled self incrimination.

Bae first talked to police at the scene of the fire. After a brief conversation with Detective Bruce McElrath, Bae agreed to go to a police station to take a polygraph test. He was not under arrest. While waiting to take the polygraph test Bae called an attorney who spoke to both him and McElrath. McElrath told the attorney that Bae was at the station to substantiate his story and take a polygraph test. The attorney told Bae to go ahead and take the test, and then told McElrath that Bae could take the test. He also told McElrath he would not be present for the test.

After Bae took the polygraph test, which took about two hours, Detective William Johnston told Bae he had flunked. Johnston then read Bae his *Miranda* rights and placed him under arrest. The police took Bae to another police station at about 3:15 p.m. where, after again being read his rights, he made a statement. Bae repeated this statement to an Assistant State's Attorney around 6:30 p.m., and repeated it again before a court reporter a short time later.

According to the police, Bae was read his *Miranda* rights before he made each statement. The police also testified that after being arrested, Bae never asked to speak to an attorney. Bae, on the other hand, testified that he repeatedly asked to speak to an attorney but that the police, and the Assistant State's Attorney to whom he also confessed, ignored his requests.

Bae filed a motion to suppress his statements and the trial court held a suppression hearing. At the same hearing, the judge heard evidence on and considered Kim's motion to suppress a confession he had made. Both Bae and Kim argued that their confessions were coerced and were made after police denied them the opportunity to speak to their attorneys. The police officers testified that neither Bae nor Kim asked for counsel after their arrests. The trial judge believed Kim and disbelieved the police officers' testimony about Kim, and

granted his motion to suppress; however, he disbelieved Bae and believed the officers' testimony about Bae, and denied Bae's motion.

Bae raises two arguments to attack his confession's admissibility. First, he argues that he made his confession only after the police continued to interrogate him after he requested counsel. Second, he argues that in any event the circumstances surrounding his confession show that it was involuntary.

■ Bae's first argument is based on *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). In *Edwards,* the Supreme Court held that "when an accused has invoked his right to have counsel present during custodial interrogation," the police must cease interrogating him and may not initiate further interrogation outside counsel's presence. *Id.* at 484–85, 101 S.Ct. at 1884–85. According to Bae, he repeatedly asked to speak to an attorney, but despite his requests the police kept questioning him, without an attorney present, until he confessed.

■ The problem with this argument is that the state courts believed the police officers who testified that Bae never asked to speak to an attorney after his arrest. See generally 126 Ill.Dec. at 310–11, 531 N.E.2d at 936–37. Since *Edwards* prohibits only interrogation after a request for counsel, the finding that Bae did not request counsel should dispose of Bae's argument that the police violated *Edwards,* 28 U.S.C. § 2254(d) requires that a federal court in habeas corpus proceedings presume that a state court's written findings of fact are correct unless one of the conditions listed in § 2254(d)(1)–(8) exists. None of those conditions exist. The trial court held a full evidentiary hearing at which Bae, represented by counsel, was able to call witnesses and cross-examine the state's witnesses. Bae had a full opportunity to present the facts necessary to support his motion to suppress. The police officers' testimony, which the trial judge believed, amply supported the finding that Bae never asked to speak to an attorney.

Despite this, Bae argues the district court should have disregarded the state court's finding that he never requested counsel. According to Bae, this finding is not fairly supported by the record, see 28 U.S.C. § 2554(d)(8), because the same judge who believed the officers' testimony that Bae never asked for counsel disbelieved their testimony that Kim never asked for counsel. Bae asserts that to conclude the police were lying about Kim but telling the truth about him is logically inconsistent, and that this inconsistency is fatal to the state court's finding that he never asked for counsel.

Bae is wrong. It is not a foregone conclusion that if a witness lies about one fact he must be lying about every other fact he testifies to. It is perfectly logical to conclude that parts of a witness' testimony are true and other parts are false. That is particularly so in this case. As the state appellate court noted, the circumstances surrounding Bae's and Kim's confessions differed significantly. Bae confessed first; the police did not even arrest Kim until Bae fingered him as an accomplice, and Kim did not confess until the day after Bae confessed. Evidence in Kim's case tended to show that the police deliberately thwarted attempts by attorneys to contact him; no such evidence existed regarding Bae. A disinterested witness testified to seeing Kim very forcefully demand to speak to an attorney; no witnesses corroborated Bae's story. It was reasonable to conclude from all this (and other testimony) that the police, having legally obtained a confession from Bae naming Kim, were determined to extract a confession from Kim to solidify their case against him regardless of the methods they had to use. The trial judge noted that "there was a specific turning point in the conduct of the detectives at the time of Suk Kim's arrest." See 126 Ill.Dec. at 31, 531 N.E.2d at 937. The state court had ample basis for accepting the police officers' story about Bae while rejecting their story about Kim. Section 2254(b)'s presumption of correctness applies to the state court's finding here. Since Bae did not request to speak to an attorney, the police did not violate *Edwards* by continuing to question him.

■ Bae's second argument for suppressing his confession is that the confession was involuntary. A state court's finding that a confession was voluntary is a legal finding subject to de novo review by the district court in a habeas corpus proceeding. *Miller v. Fenton*, 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985); *Anderson v. Thieret*, 903 F.2d 526, 529 (7th Cir.1990). However, the state court's subsidiary factual findings are entitled to 28 U.S.C. § 2254(d)'s presumption of correctness.

This case presents a slight twist. Bae complains that the district court never made an independent finding that his confession was voluntary. That is true; the district court's opinion focused on Bae's allegation that he asked for and was denied counsel rather than examining all the circumstances surrounding the confession to determine if it was voluntary. This is not surprising, however. Although Bae's petition set out facts beyond his assertion that he asked for counsel, and his argument briefly touched on a more general argument that his confession was involuntary, Bae's petition and briefing in the district court focused on the police's alleged refusal to allow him to speak to an attorney. Indeed, his appellate brief mirrors his district court briefing. However, his brief does arguably present an argument that his confession was involuntary. Since the state does not argue Bae has waived this argument, and since we are in as good a position as the district court to consider it, we will review de novo Bae's contention that his confession was involuntary.

Bae's argument fails on the merits. As the state courts found, Bae spoke to an attorney soon after arriving at the police station, and never requested an attorney afterward. The record contains no evidence of physical coercion. Bae's post-arrest interrogation was not unusually long. See 126 Ill.Dec. at 310, 531 N.E.2d at 937. The record fairly supports these findings.

■ Bae cites two facts that he says show his confession was involuntary.

First, he points to his trial testimony that he did not think the police would allow him an attorney and that he thought the police would physically abuse him if he did not confess because that is how suspects are treated in Korea. This fact, though, is irrelevant. The police did not put this thought in Bae's head and Bae points to no evidence that the police knew about or took advantage of his fears. Absent improper police coercion, a defendant's mental state does not render a confession involuntary under the due process clause. *Colorado v. Connelly*, 479 U.S. 157, 163–67, 107 S.Ct. 515, 519–22, 93 L.Ed.2d 473 (1986); *Anderson*, 903 F.2d at 530 n. 1.

■ Bae also points to the fact that the police told him he flunked the polygraph test. But Bae does not explain why this was improper; he does not even try to show that what the police told him was not true. Telling Bae (truthfully, we must presume) that he failed a polygraph test that his attorney allowed him to take was not the kind of improper conduct that can render a confession involuntary. Given all the circumstances in this case, we agree with the state courts that introducing Bae's confession at trial did not violate the due process clause.

## III.

■ Bae argues that he received ineffective assistance of counsel at trial. To establish that his attorney's performance was constitutionally ineffective, Bae must first show that his attorney's performance was deficient. We measure an attorney's performance against "an objective standard of reasonableness" based on "prevailing professional norms," all the while "indulg[ing] a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, [Bae] must overcome the presumption that, under the circumstances, the challenged actions might be considered trial strategy." *Strickland v. Washington*, 466 U.S. 668, 687–91, 104 S.Ct. 2052, 2064–67, 80 L.Ed.2d 674 (1984); see also *United States v. Nolan*, 910 F.2d 1553, 1563 (7th Cir.1990).

Bae must also show that his attorney's deficient performance prejudiced his defense. *Strickland*, 466 U.S. at 682, 104 S.Ct. at 2061–62. To show prejudice, Bae must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068.

■ Bae's trial attorney's strategy was to attack the reliability of Bae's confession. Counsel questioned Bae extensively about the circumstances surrounding his arrest, police interrogation, and his written and oral statements. He vigorously cross-examined the police officers who testified about the confession. Counsel argued forcefully in his closing argument about why Bae's confession was involuntary and therefore unreliable.

Since Bae's confession was the centerpiece of the state's case, it was not unreasonable strategy for Bae's attorney to focus Bae's defense on attacking the confession. Even so, Bae argues that his attorney should have done more. Bae first argues that counsel's attacks on the confession were insufficient; Bae insists that his attorney should have brought to the jury's attention that Bae confessed only after the police told him he had flunked a polygraph test. But to have mentioned the failed polygraph test could well have been to help the state pound the nails into Bae's coffin. Although polygraph test results are generally considered to be unreliable, jurors still might place great reliance on those results. See *People v. Thomas*, 123 Ill.App.3d 857, 79 Ill.Dec. 278, 286, 463 N.E.2d 832, 840 (1st Dist.1984) (noting that jurors often view polygraph evidence as "virtually infallible"). As Bae points to no evidence showing the police lied to him about the polygraph test result, mentioning his failure to pass the test most likely would have led the jury to believe he did flunk it, and therefore lied. Counsel's failure to mention the polygraph result was (to put it mildly) reasonable strategy.

■ Bae's other attacks on his trial attorney's performance center on his attorney's alleged failure to present evidence Bae says would have been helpful to his defense. Bae argues that his attorney should have introduced documents that would have shown Vicstar was financially sound and that Bae had no financial motive to set fire to his business. According to Bae, Vicstar's financial statements and other documents would have shown that Vicstar was a sound, growing business. Those documents also would have corroborated his testimony that Vicstar had substantial inventory, that Bae had a substantial amount of his own money sunk in the business, and that Vicstar's insurance would not nearly cover the loss that Bae could expect from destroying his business.

Bae has not overcome the presumption that his attorney's refusal to introduce the documents he cites was reasonable trial strategy. Although the documents might have tended to show that Vicstar's inventory was greater than the state claimed it was and that Vicstar's sales had increased in 1984, the financial information was a mixed bag. The documents would also have shown that Vicstar's 1984 profits were meager and that Vicstar owed substantial debts. Moreover, Bae's attorney did argue that Bae had no financial motive to set any fire, based on evidence introduced at trial. Bae's attorney noted that Bae would not receive the insurance proceeds because the proceeds were payable to the Korean Exchange Bank as security for a $158,000 note it had issued. Both the insurance policy and note were in evidence. Bae also testified that he had sunk over $60,000 of his own money into certificates of deposit as security for company loans. This testimony was corroborated by a stipulation that the Korean Exchange Bank held certificates of deposit totalling approximately $65,000 as security on Vicstar's debt. Given the mixed picture the financial documents showed and the evidence in the record that would substantiate Bae's position that he had no motive to set the fire, it was reasonable trial strategy for Bae's attorney not to further highlight Vicstar's financial condition.

■ Bae also complains that his trial attorney refused to present at trial, or even interview, three witnesses (two employees and a regular customer) whom Bae told him could corroborate that Vicstar had substantial inventory. But Bae himself admitted that his attorney spoke to one of his employees who refused, for reasons unknown, to testify. As for the other two witnesses, Bae does not state in any detail precisely what these witnesses could have testified to other than to state that they could have corroborated his own testimony about Vicstar's inventory. Even assuming these witnesses could have given credible testimony that Vicstar's inventory was substantially greater than the state claimed it was, Bae has not shown a reasonable probability that this testimony would have changed the trial's outcome. Bae's confession made his defense a daunting task. Although Bae's attorney tried valiantly to show the confession was unreliable, substantial evidence corroborated the confession in significant respects. Three details stand out. First, Bae's confession fingered Suk Kim; there was no evidence the police suspected Kim before Bae confessed; the fire was caused by the ignition of isopropyl alcohol contained in plastic bottles; a search of Kim's garage just happened to turn up a case of plastic isopropyl alcohol bottles, similar to those found at the arson scene; that case was missing several bottles. All this may have been coincidence but it was much more likely not coincidence. Second, phone records from the day before and night of the arson connected Bae to Kim. Finally, the evidence showed the fire was an inside job; by Bae's own admission at trial, the arsonist could not have entered the building unless somebody let him in. Since Bae's business partner, Lee, was in Korea, the only insider left was Bae. All this evidence was damning to Bae, and it is doubtful that one witness' testimony that Vicstar had substantial inventory would have turned the trial in Bae's favor.

Bae raises several other alleged deficiencies in his attorney's performance in the fact section of his brief, which he does not

elaborate on in his argument. We need not detail those complaints. It suffices to say that it is unlikely any of these alleged deficiencies actually did constitute deficient performance by counsel; in any event, none of these alleged deficiencies in counsel's performance was reasonably likely to have changed the trial's outcome.

Besides cataloging his trial attorney's alleged errors, Bae also contends that the trial court deprived him of the effective assistance of counsel of his choice during the post-trial motions period and at sentencing. After his conviction, Bae decided that his court-appointed attorney's performance was ineffective. Bae therefore decided he wanted a new attorney, and told the trial judge so. Bae's attorney also moved to withdraw because of Bae's dissatisfaction with him. On the day Bae was sentenced, the trial judge denied Bae's request for new counsel and his attorney's motion to withdraw.

█ The right to counsel of choice Bae asserts is a narrowly limited right. Conflicts between attorney and client justify substitution of appointed counsel only when " 'counsel and defendant are so at odds as to prevent presentation of an adequate defense.' " *United States v. Morrison*, 946 F.2d 484, 498 (7th Cir.1991) (quoting *United States v. Hillsberg*, 812 F.2d 328, 333 (7th Cir.1987)). While it is true that Bae was dissatisfied with his attorney's trial performance, he has not even attempted to show why his conflict with his attorney could have prevented his attorney from adequately representing him during the post-trial motions period or at sentencing. Moreover, even if the trial judge should have granted Bae's motion, any error was harmless unless his attorney's performance after the motion was denied was constitutionally ineffective. See *id.* at 499. Bae has not alleged any deficiencies in his attorney's handling of his post-trial motions or sentencing. Therefore, the trial court's refusal to appoint new counsel for Bae did not violate his Sixth Amendment right to counsel.

## IV.

Bae raises several other arguments for granting habeas corpus.

### A.

The state initiated its case against Bae by indictment. See Ill.Rev.Stat. ch. 38, para. 111–2. The indictment originally charged that the burned building was owned by Victor Montanez, one of the people who lived in the second-floor apartment. Over Bae's objection, the trial judge allowed the state shortly before trial to amend the indictment to name Sabhi Chehade as the building's owner.

Bae argues that allowing the amendment, without resubmitting the indictment to the grand jury, violated his right to be indicted by a grand jury. The Fifth Amendment provides that "no person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury...." But in *Hurtado v. California*, 110 U.S. 516, 4 S.Ct. 111, 28 L.Ed. 232 (1884), the Supreme Court held that no federal right to a grand jury exists in state prosecutions. The Court has consistently reaffirmed this holding. See, e.g., *Alexander v. Louisiana*, 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972); see also *Liner v. Phelps*, 731 F.2d 1201, 1203–04 (5th Cir.1984); *Watson v. Jago*, 558 F.2d 330, 337 (6th Cir.1977) (both citing Supreme Court cases).

█ A federal court may grant habeas corpus relief to state prisoners only for violations of federal law. 28 U.S.C. § 2254; *Engle v. Isaac*, 456 U.S. 107, 119, 102 S.Ct. 1558, 1567, 71 L.Ed.2d 783 (1982). Bae had no federal constitutional right to be indicted by a grand jury, so an allegation that an indictment amendment violated his right to be indicted by a grand jury should not be sufficient grounds to grant habeas corpus. However, *Ballard v. Bengston*, 702 F.2d 656 (7th Cir.1983) (per curiam), potentially complicates matters. In *Ballard*, a state habeas petitioner alleged that the indictment in his case was unconstitutionally vague. After noting that "the constitutional requirement of a

grand jury indictment is not applicable to the states," we went on to state that "the validity of an indictment is subject to measurement against general fourteenth amendment guarantees of due process." *Id.* at 660.

It is certainly reasonable to state that an indictment must meet general Fourteenth Amendment standards. No matter how a state chooses to charge a criminal defendant, the due process clause requires that a criminal defendant receive "notice of the specific charge, and a chance to be heard in a trial of the issues raised by that charge." *Cole v. Arkansas,* 333 U.S. 196, 201, 68 S.Ct. 514, 517, 92 L.Ed. 644 (1948); *Olsen v. McFaul,* 843 F.2d 918, 930 (6th Cir.1988). In other words, a criminal defendant must receive adequate notice of the charges against him so that he may defend himself against those charges. *Koontz v. Glossa,* 731 F.2d 365, 369 (6th Cir.1984). A vague indictment (as was alleged in *Ballard*) or a last-minute change in the charge could prejudice a defendant's opportunity to defend himself; if that prejudice is severe enough, a due process violation could occur. See, e.g., *id.* at 369–70; *Watson,* 558 F.2d at 337.

But *Ballard,* after noting that state indictments are subject to general due process analysis, went on to base the due process analysis on the analysis federal courts employ in determining whether federal indictments are sufficient. See *Ballard,* 702 F.2d at 660–61. Thus, among other things *Ballard* stated that "a bill of particulars cannot save an unconstitutionally vague indictment." *Id.* at 661. The court based this statement on the Supreme Court's observation in *Russell v. United States,* 369 U.S. 749, 770, 82 S.Ct. 1038, 1050–51, 8 L.Ed.2d 240 (1962), that to allow the prosecution or trial court to change what is alleged in an indictment (by amendment or a bill of particulars) would deprive the defendant of his right to be tried only for charges found by a grand jury. See *Ballard,* 702 F.2d at 661 n. 2.

But if a defendant has no federal constitutional right to be indicted by a grand jury, it makes no difference as a matter of

federal constitutional law if a bill of particulars or an indictment amendment contains facts or charges not found by the grand jury. So long as the defendant has received adequate notice of the charges against him so that he has a fair opportunity to defend himself, the constitutional requirement is met. Justice Douglas, in *Alexander,* espoused the view that once a state chooses to charge by grand jury indictment, it is bound by federal constitutional standards concerning grand juries and indictments. See 405 U.S. at 636, 92 S.Ct. at 1228 (Douglas, J., concurring). But the majority in *Alexander* declined to accept this view, and no other Supreme Court case has accepted it. See *id.* at 633, 92 S.Ct. at 1226–27; see also *Liner,* 731 F.2d at 1204; *Watson,* 558 F.2d at 337. Although one could read *Ballard* as equating due process standards with standards grounded in the federal right to indictment by a grand jury, such reasoning would essentially extend the federal grand jury right to state defendants (at least where the state chooses to charge by grand jury indictment). Were we to follow this course we would effectively elevate Justice Douglas' concurrence in *Alexander* to Supreme Court precedent in spite of *Hurtado*—a case the Supreme Court has never repudiated and often reaffirmed. If there were a conflict between this circuit's precedent and Supreme Court precedent, we are bound to follow the Supreme Court.

However, despite *Ballard's* apparent equation of due process standards with standards grounded in the right to grand jury indictment, no real conflict exists between *Hurtado* and *Ballard's* actual holding. *Ballard* involved an allegedly vague indictment; the court found against the petitioner, holding that he had not sufficiently shown how the indictment's alleged vagueness had prejudiced him in conducting his defense. 702 F.2d at 661. Since *Ballard's* discussion about Fifth Amendment standards was not necessary for that holding, that discussion is dicta and not binding in this case.

Since Bae was not entitled to a grand jury indictment, his claim that the indictment's amendment deprived him of his

right to a grand jury indictment states no federal claim upon which to grant a writ of habeas corpus. Bae does not argue this issue as a due process issue. In any event, he does not attempt to show how the amendment hindered his defense, so any due process argument would falter at the start.

### B.

■ Bae argues that the state introduced insufficient evidence to convict him of arson with the intent to defraud an insurer. The indictment alleged that General Accident Insurance Company insured Bae's business; evidence at trial established that Potomac Insurance Company, not General Accident, was the insurer. While agreeing with Bae that the intent to defraud a named insurer was an essential element of arson with intent to defraud an insurer, the state appellate court rejected his argument that the proof at trial was insufficient to convict. See *Bae*, 126 Ill. Dec. at 312, 531 N.E.2d at 939. The court noted that an insurance agent had testified that Potomac "is part of General Accident Insurance Company." *Id.* The court went on to state that Bae had failed to establish that the proof at trial "materially varie[d] the allegation in the indictment . . . in such a way as to require reversal." *Id.*

The appellate court's holding is a bit ambiguous. It is possible to read the court's discussion as holding that to defraud an insurer that is part of the same organization as the named insurer is to defraud the named insurer. In other words, under Illinois law, the word "insurer" in the arson statute, Ill.Rev.Stat. ch. 38, para. 20–1(b), could mean "insurer or any other insurer part of the same organization" (e.g., a subsidiary). There was sufficient evidence for a reasonable jury to find that Potomac was "part of" General Accident. The meaning of paragraph 20–1(b) is a question of state law; we have no authority to overturn a state court's decision on the meaning of state law. *Bates v.*

*McCaughtry*, 934 F.2d 99, 101–02 (7th Cir. 1991). Bae "cannot obtain a second opinion on the meaning of state law" by disguising his attack as a claim that the evidence was insufficient to convict him. *Id.* at 102.

It is also possible to read the state appellate court's discussion as holding that a variance existed between the indictment and the proof at trial but that this variance did not require reversal. Under this interpretation Bae also loses. Again, there is no problem of proof; the state introduced sufficient evidence to prove that Bae intended to defraud a named insurer. True, the insurer named at trial was different than the one named in the indictment. But the critical element making Bae's act illegal was the intent to defraud his insurer; the insurer's name was just an extension of that element. Cf. *United States v. Cina*, 699 F.2d 853, 857 (7th Cir.1983). Bae does not argue that the variance prejudiced him in any way. He does not argue that the variance deprived him of his right to adequate notice of the charges against him or that the variance prevented him from effectively defending himself. In short, the variance regarding insurers violated none of Bae's constitutional rights.[1]

### C.

■ The trial judge instructed the jury that it could find Bae guilty of murder if it found that he was legally responsible for the act that caused the firemen's death (i.e., the fire) and if he: intended to kill the firemen; knew that his act would kill or cause great bodily harm to the firemen; knew that his act created a great probability of death or great bodily harm to the firemen; *or* was committing arson. The trial judge distributed three separate verdict forms for murder, one for each fireman. Each verdict form provided for a "guilty" or "not guilty" finding without distinguishing between the four separate theories of murder each juror could base his finding on.

---

1. Bae argues that we must reverse his murder convictions because those convictions might rest on his allegedly invalid arson convictions.

Because we have upheld Bae's arson convictions, this argument fails.

Bae complains that the general verdict forms violated his right to due process because the jury could find him guilty of murder without having to agree unanimously on which of the four murder theories it based its finding. For example, six jurors could have found Bae intentionally killed the firemen, while six found that he killed the firemen while committing arson (but not actually intending their deaths). This case, however, does not present the problem Bae posits. The jury found Bae guilty of arson. From that verdict, we know that the jury unanimously found that Bae was legally responsible for the act (the fire) that caused the firemen's deaths and that Bae committed arson. In other words, we know that the jury agreed unanimously on one of the four murder theories presented to it. That being the case, any error in submitting general verdict forms on the murder counts was harmless.

In any event, the Supreme Court's recent decision in *Schad v. Arizona*, —— U.S. ——, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991), forecloses Bae's argument. In *Schad*, the Court held that instructing a jury that it could find Schad guilty of murder if it found either that Schad killed his victim as the result of premeditation or while committing robbery, while not requiring the jury to agree unanimously on one or the other theory, did not violate Schad's right to due process. See *id.* 111 S.Ct. at 2496–2504; *id.* at 2506–07 (Scalia, J., concurring). Bae has suggested no reason why we should treat his case any differently than the Supreme Court treated Schad's. In light of *Schad*, the state court did not violate Bae's right to due process by submitting the general verdict forms.

#### D.

▮ Bae finally contends that the prosecutor's improper closing argument deprived him of a fair trial. Bae complains about remarks characterizing him as a "joker," a "liar," "greedy, dishonorable, calculating, and cruel," "evil," and a "master accounter" or "master accountant" (apparently in reference to Bae's accounting degree). Because Bae did not object to these remarks at trial or in his post-trial motions, the state appellate court held that Bae waived his right to complain about these remarks on appeal. 126 Ill.Dec. at 313, 531 N.E.2d at 940. Bae's procedural default, which the appellate court expressly relied upon in deciding his claim, bars Bae from raising this issue in a habeas corpus proceeding unless he can show cause for and prejudice resulting from the default. *Harris v. Reed*, 489 U.S. 255, 260–66, 109 S.Ct. 1038, 1041–45, 103 L.Ed.2d 308 (1989). Bae suggests counsel's incompetence as cause for the default but he presents nothing to overcome the presumption that failing to object to the prosecutor's comments was a reasonable tactical decision or that a reasonable probability exists that objecting to those comments would have changed the trial's outcome. Indeed, we tend to agree with the state appellate court that the prosecutor's comments, while blunt and derogatory (and possibly hyperbolic), were fair comments on the evidence. See 126 Ill. Dec. at 312, 531 N.E.2d at 940.

▮ Bae also raises two statements that he did object to at trial. First, Bae complains about the prosecutor's remark that he was "disturb[ed]" and "disgusted" because Bae had called Suk Kim's sister-in-law as a witness. Although the prosecutor did not come out directly and say it, the fair inference from his comment was that the prosecutor was "disgusted" because Bae had called Kim's sister-in-law to lie for him. The trial judge sustained Bae's objection to this comment, struck the statement, and instructed the jury to disregard it.

Bae also complains about the prosecutor's references to the deceased and injured firemen and their families. The trial court sustained Bae's objection to those references. When the prosecutor obstinately referred to the firemen again, the trial judge once again sustained Bae's objections. He also strongly warned the prosecutor that his remarks were improper, told the prosecutor that any further remarks about the firemen would result in a contempt citation, and stated: "This jury is not going to decide the case on the condition of [the injured fireman] or the deaths of those fire-

men. They are going to decide it on the evidence."

The trial judge's prompt action sufficiently cured any prejudice to Bae from the prosecutor's remarks about his "disgust" with Bae and about the deceased and injured firemen. We assume that jurors follow the trial court's instructions. See *Francis v. Franklin*, 471 U.S. 307, 324 n. 9, 105 S.Ct. 1965, 1976 n. 5, 85 L.Ed.2d 344 (1985). There is no reason to believe it likely that the jury in this case disregarded the judge's instructions and decided Bae's fate based on anger or resentment toward him rather than on the evidence. Bae has not shown that the prosecutor's comments deprived him of a fair trial.

See also 894 F.2d 1338.

## V.

For the reasons set forth above, we affirm the district court's judgment denying Bae's petition for a writ of habeas corpus.

AFFIRMED.